OPINION *Page 2 
{¶ 1} Defendant-Appellant, Betty J. Gibson, appeals the judgment of the Marion County Court of Common Pleas, Family Division, granting Plaintiff-Appellee's, Jeff H. Gibson, complaint for divorce and awarding him a certificate of deposit, a residence, and vehicles. On appeal, Betty asserts that the trial court erred in determining that the certificate of deposit, residence, and vehicles were the sole premarital property of Jeff Finding that the trial court did not err in its determination, we affirm the judgment of the trial court.
 {¶ 2} The parties began cohabiting in November 1992, and married on April 1, 2005. No children were born as issue of the relationship or marriage.
 {¶ 3} In April 2006, Jeff filed a complaint for divorce, in which he requested his premarital real and personal property, specifically including real property at 721 Fountain Street, Marion (hereinafter referred to as "the residence") and a 1998 Ford Ranger vehicle. Additionally, Jeff indicated that he owned a 1984 Oldsmobile van, a 1996 Ford Thunderbird vehicle, a checking account at Chase Bank, and a savings account at Marion Community Credit Union (hereinafter referred to as "MCCU"). *Page 3 
 {¶ 4} In May 2006, Betty moved for temporary orders, requesting that she receive exclusive use of the residence, a 1996 Ford Taurus vehicle, a 1993 Oldsmobile van, a 1997 Ford Thunderbird vehicle, and, a 1998 Ford Ranger vehicle; that Jeff pay spousal support in the amount of $350 per month; that, in addition to arrearages, Jeff pay the mortgage on the residence in the amount of $387.81 per month; that Jeff pay the Visa and other marital debts; and, for an accounting and verification of the whereabouts of funds Jeff allegedly removed from a certificate of deposit at MCCU. Additionally, Betty filed her answer to the complaint for divorce.
 {¶ 5} In June 2006, the trial court granted Betty exclusive use of the residence, the 1996 Ford Taurus vehicle, and the 1993 Oldsmobile van, and ordered Jeff to pay the monthly mortgage and arrearages on the residence. The trial court declined to award any spousal support.
 {¶ 6} In July 2006, Betty requested that Jeff be held in contempt for failing to abide by the temporary order to pay the mortgage on the residence and arrearages.
 {¶ 7} In October 2006, Betty moved for modified temporary orders, requesting that Jeff supply her with current and valid license plates and reestablish and pay the insurance coverage on the 1993 Oldsmobile van. *Page 4 
 {¶ 8} In January 2007, the trial court held the final divorce hearing, during which the following testimony was heard regarding the disputed bank account funds.
 {¶ 9} William Clark, operations manager and record keeper of MCCU, testified that, in the 1990s, Jeff and Betty opened a "share account," which is basically a savings account; that Jeff and Betty both used the account; that Jeff and Betty, as owners of the share account, both had equal access and equal rights to the account and could withdraw the funds without the other party's approval.
 {¶ 10} Concerning the certificate of deposit in issue, Clark testified that parties with share accounts can open "subaccounts" such as certificates of deposit; that, on January 14, 2002, $5,394 was deposited into the share account from Progressive Max; that, on February 12, 2002, a tax refund of $6,348 was deposited in the share account; that on June 21, 2002, $11,000 was withdrawn from the share account and transferred to a certificate of deposit (hereinafter referred to as "2002 CD"); that, on December 24, 2004, $10,062.79 was withdrawn from the 2002 CD and deposited into the share account; that, on February 23, 2005, a $6,031 tax refund was deposited into the share account; that, on March 18, 2005, $15,000 was withdrawn from the share account and transferred into a new nine-month certificate of deposit (hereinafter referred to as "2005 CD"); that there were several small withdrawals from the 2005 CD from *Page 5 
March 18, 2005 until December 19, 2005; and, that, on December 19, 2005, the 2005 CD matured in the amount of $14,089.03, was withdrawn in its entirety, and was closed.
 {¶ 11} Further, Clark testified that on September 9, 2003, $2,000 was deposited into the share account from Erney Associates; that the parties opened a six-month certificate of deposit (hereinafter referred to as "2003 CD") on September 9, 2003; that the 2003 CD was designated as jointly owned by Jeff and Betty; that the 2003 CD was funded with another deposit from Erney Associates in the amount of $3,000; that the 2003 CD was closed on January 30, 2004; that $403.25 of the 2003 CD was used to repay a loan at MCCU; that $1,000 of the 2003 CD was put into a money market account; that the money market account was closed on August 14, 2004; that $1,605.22 of the 2003 CD was transferred into the parties' joint checking account on January 30, 2004; and, that, three weeks later, on February 19, 2004, the checking account was overdrawn.
 {¶ 12} Jeff testified that he has been employed at Liberty Castings for ten to twelve years; that he earned approximately $40,000 in 2006; that he established the 2005 CD in both his and Betty's names for $14,000; that the $5,394 from Progressive Max deposited into the share account in January 2002 was from an insurance payment for damage to his vehicle; that the tax refunds deposited into *Page 6 
the account were his because Betty was not working; that Betty received an insurance payment in 2003 from a car accident; that the insurance proceeds Betty received were not put towards the 2005 CD; that Betty seldom received child support during the premarital relationship or the marriage; that, on December 19, 2005, he withdrew $14,089.03 from the 2005 CD and deposited it into a Chase Bank account; that he used the funds from the 2005 CD to pay his rent and purchase furniture after moving out of the residence because he did not take any property with him when he left; and, that he spent the entire 2005 CD.
 {¶ 13} Betty testified that she has six children from previous relationships; that most of her children lived with her and Jeff at the residence for periods of time during the relationship; that Jeff has worked at Liberty Castings for approximately five years, not ten; that she has not filed any income tax returns since 1996; that Jeff filed income tax returns during their relationship and sometimes claimed her and her children as dependents with her consent; that Jeff did not support her and her children; that the $6,348, $6,031, $5,246, and $1,000 tax refunds deposited in the share account from 2001 through 2005 were Jeffs tax refunds; that she and Jeff started a home improvement business, which was his business, but "[she] and the kids would help him go and clean it up" (hearing tr., p. 212); that she had been working for the Marion Star "on and off for seven *Page 7 
years" but was "mostly a housewife" (hearing tr., p. 210); and, that she earned approximately $100 per year from working for the Marion Star.
 {¶ 14} Additionally, Betty testified that she received a $6,621.03 insurance settlement from a car accident on September 9, 2003; that she deposited $2,000 of the insurance settlement into the share account on September 9, 2003; that, on October 22, 2003 the balance of the share account was $15.54; that she deposited $3,000 of the insurance settlement into the 2003 CD; that she closed the 2003 CD containing the insurance settlement money on January 30, 2004; that she thinks the insurance settlement money was spent towards paying bills, purchasing a car, "hunting stuff," shoes, bows and arrows, and guns; that she believes the $14,000 from the 2005 CD is hers "because [she] put it in [their] account. [She] got hurt for that money * * *" (hearing tr., p. 219); that the money in the share account was "all the money that [she and Jeff had] made together, his money, [her] money, [her] child support, in an account" (hearing tr., p. 220); that, for part of the relationship, she was receiving child support payments for two of her children and social security for one child; that, in 2004, one of her children's father owed $11,456.61 in child support arrearages; but, that she only received $2,936.69 of the arrearage amount because she owed $8,500 to the county because she had been on public assistance. *Page 8 
 {¶ 15} The following testimony was heard regarding the disputed residence.
 {¶ 16} Jeff testified that he has owned the residence since 1996; that the deed to the residence is in his name only; that he purchased the residence for $32,500 with a $29,560 mortgage and a $3,000 down payment; that his money was used to make the down payment; that the residence belongs to him; that Betty delivered the money for the down payment, but it was his money and he had given her power of attorney; that he refinanced the residence in 1999, obtaining $8,495.95; that the $8,495.95 was deposited in the share account and was used to make improvements to the residence; that he has made all of the mortgage payments on the residence; that Betty's funds were never used to make the mortgage payments on the residence; that Betty never financially contributed to the residence; that Betty has not worked since 1996 except for delivering newspapers; that he "pretty much did support [Betty and her children] through the years" (hearing tr., p. 138); that he claimed her children as dependents on his tax returns with her consent because he was supporting them; that he moved out of the residence around December 15, 2005, and has not returned; that the residence was appraised for tax purposes at $41,000; that he believes the residence is only worth $30,000 because of its condition; and, that he still owes $32,000 in mortgage payments on the residence. *Page 9 
 {¶ 17} Betty testified that Jeff did not purchase the residence, but that they purchased it together; that Jeff borrowed $29,500 to purchase the residence; that the deed is in Jeff's name only; that all of the mortgages are in Jeff's name only; that she has lived in the residence since 1996; that she did not pay Jeff rent to live in the residence, but they shared the house payments; that she has not earned any reportable income since 1996; that she paid the down payment on the residence in 1996 with her 1995 income tax refund and an insurance settlement from a car accident; that she thought the insurance settlement was around $2,500, but she did not remember the bank in which she had deposited it; that the tax refund was "probably around $3,000" (hearing tr., p. 205); that none of the money in the down payment was Jeff's; that her name is on the receipt for the down payment "because I'm the one that handed them the money. And they asked me where I got the money * * * [and] I gave them the money out of my certificate and I told them how I got it, and that's what happened" (hearing tr., p. 207); and, that Jeff's name is also on the receipt for the down payment, but she is not sure why.
 {¶ 18} Further, Betty testified that she put "a lot of hard work" into the residence by "painting and carpet, and [she] helped tear the walls out, [she] helped buy materials, [she] helped build flower beds, [she] helped put money in towards supplies, flower beds, paint" and by purchasing paneling for three walls and the stairs (hearing tr., pp. 208-209); that she obtained the money to purchase *Page 10 
the paneling from working, child support, her son's Social Security, and her own money; that she thinks the house is worth $40,000; that she and Jeff separated on December 15, 2005; and, that she has remained in the residence since that time.
 {¶ 19} The following testimony was heard regarding the disputed vehicles.
 {¶ 20} Betty testified that most of the vehicles acquired during the relationship were titled in Jeff's name; that her sister gave her money during the relationship to purchase a 1998 Neon vehicle[1]; and, that her sister transferred the money into the parties' share account, and the vehicle was titled in Jeff's name, but that it was really a gift for her (hearing tr., p. 93); that, from the vehicles, she wants the 1993 Oldsmobile van, 1998 Ford Ranger, and recreational vehicles; and, that she believes she should receive the Ranger because it was paid off with part of the money from refinancing the house.
 {¶ 21} Jeff testified that he purchased the 1998 Ford Ranger during the relationship but prior to the marriage.
 {¶ 22} Thereafter, the trial court issued its judgment entry decree of divorce, stating, in pertinent part:
 The Court finds that the term of this marriage is from the date of the marriage April 1, 2005, until the date of the final hearing, January 11 [sic] 2007. *Page 11 
 In 1991, the Ohio Legislature abolished Common Law Marriage. See Ohio Revised Code Section 3205.12(B). Consequently, this Court is limited in addressing the issues with respect to property and debts to those that arose during the marriage.[2] * * *
 [Betty] claims that she is entitled to an interest in the [residence]. The [residence] was purchased in 1996. The deed and the mortgage are only in [Jeff's] name. She claims that she made a down payment in the amount of $5,000.00 from her separate funds. [Betty] attempted to trace her separate money for the down payment. She was not successful in tracing her claim. Her documentation and corroboration evidence supporting her claim is not credible. The Court finds that there has been no increase in the value of the real estate other than passive. The Court therefore finds that the real property is the separate property of [Jeff].
 * * *
 There was substantial testimony with respect to the parties [sic] account at the Marion Community Credit Union. [Betty] attempted to trace pre-marital funds through the account seeking to be restored to the ownership of that money. The evidence showed that the monies [Betty] contributed prior to the marriage had also been dissipated prior to the marriage.
 * * *
 Several large deposits and transfers were made that are traceable to various events. These include a deposit on January 14, 2002, from Progressive Max in the amount of $5,394.00, and a deposit, on February 12, 2002, of a tax refund in the amount of $6,348.00. In June on June 21, 2002, a CD was established in the amount of $11,000.00. [Jeff] indicated that this $11,000.00 came from the two deposits earlier in the year in January and February. The source of the Progressive Max money was from a *Page 12 
 car accident on a car owned and insured by [Jeff]. The tax refund was prior to the marriage of the parties. In 2002, the only party employed and receiving a tax refund was [Jeff]. ([Betty] claims an interest in the tax refunds because [Jeff] claimed her children as dependents. [Jeff] was able to show that [Betty] is owed back child support * * *. [Jeff] claims that he supported the children and was therefore legally entitled to claim them as dependents.) As of June 21, 2002, the $11,000.00 CD is identifiable as [Jeff's] separate property. * * * The CD had remained intact in an amount approximating $14,000.00 since February 2005. * * * The Court finds that [Jeff] successfully traced the CD as his separate property.
 * * *
 Other identifiable monies are a deposit from Ernie [sic] and Associates in the amount of $3,000.00. This was placed into a CD in the parties [sic] account at the Marion Community Credit Union in 2004. The source of these funds was a personal injury recovery by [Betty]. An examination in the testimony regarding the disposition of those funds shows that on January 30, 2004, $403.25 was applied against a loan, $1,000.00 was transfer [sic] to checking, and $1,605.22 was also sent to the checking account. The money was subsequently spent and was gone prior to the marriage. It was [Betty's] pre-marital property, but it failed to exist at the time of the marriage.
 [Betty] had another deposit from Ernie [sic] and Associates in September of 2003, in the amount of $2,000.00. The evidence shows that as of October 23, 2003, the balance in the checking account was $15.54. The court concludes this money was also spent prior to the marriage and no longer existed at the time of the marriage.
 * * *
 The Court finds that [Jeff] adequately traced the monies from the CD, the $11,000.00, through the marriage. A final transfer out of $14,089.03 was withdrawn by [Jeff] at the time that he separated from [Betty]. The Court finds it plausible and credible that those funds originated from his deposits in 2002, as well as his 2004 tax refund received in 2005, prior to the marriage. The Court therefore concludes that the $14,000.00 CD withdrawn from [Jeff] at the time of separation was his separate non-marital property. *Page 13 
 The parties own numerous vehicles.[3] The Court finds that the Chevy Nova, the Yamaha motorcycle, the Ford F150, the 1997 Ford Thunderbird, 1984 Ford F150, and the 1998 Ford Ranger were all owned by [Jeff] prior to the marriage. * * * [Betty] is awarded the 1996 Ford Taurus and the 1993 Oldsmobile * * * and two (2) go carts clear of any claim by [Jeff].
(Divorce Decree, pp. 3-10).
 {¶ 23} Additionally, the trial court found Jeff in contempt for failing to pay the mortgage and arrearages on the residence and ordered him to pay the balance, as well as Betty's attorney fees related to the contempt motion.
 {¶ 24} It is from the decree of divorce that Betty appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I THE COURT ERRED IN DETERMINING THE MARION COMMUNITY CREDIT UNION ACCOUNT WAS SOLELY THE PREMARITAL PROPERTY OF HUSBAND.
 Assignment of Error No. II THE COURT ERRED IN DETERMINING THE RESIDENCE WAS SOLELY THE PREMARITAL PROPERTY OF HUSBAND.
 Assignment of Error No. III THE COURT ERRED IN CONCLUDING THAT THE VEHICLES WERE SOLELY THE PREMARITAL PROPERTY OF HUSBAND. *Page 14 
 {¶ 25} The following standard of review applies throughout.
 Standard of Review {¶ 26} "In determining whether the trial court has appropriately categorized property as separate or marital, the standard of review is whether the classification is against the manifest weight of the evidence." Eggeman v. Eggeman, 3d Dist. No. 2-04-06, 2004-Ohio-6050, ¶ 14, citing Henderson v. Henderson, 3d Dist. No. 10-01-17, 2002-Ohio-2720, ¶ 28. Accordingly, the trial court's judgment will not be reversed if the decision is supported by some competent, credible evidence. Eggeman, 2004-Ohio-6050, at ¶ 14, citing DeWitt v.DeWitt, 3d Dist. No. 9-02-42, 2003-Ohio-851, ¶ 10. In determining whether competent, credible evidence exists, "[a] reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the testimony." Barkley v.Barkley (1997), 119 Ohio App.3d 155, 159, citing In re Jane Doe I
(1991), 57 Ohio St.3d 135.
 Assignment of Error No. I {¶ 27} In her first assignment of error, Betty asserts that the trial court erred in determining that the $14,000 2005 CD was the sole premarital property of Jeff. Specifically, Betty argues that the circumstances and conduct of the *Page 15 
parties during their relationship show that they owned the funds in the share account jointly because Jeff made an inter vivos gift to her and, because funds from that account were used to fund the 2005 CD, it should have been included in the equitable distribution. We disagree.
 {¶ 28} Initially, we note that, although Jeff and Betty had a twelve and one-half year relationship prior to being married, the parties were not married until April 1, 2005, and the marriage terminated on January 11, 2007, the date of the final hearing. See Badovick v. Badovick
(1998), 128 Ohio App.3d 18.
 {¶ 29} In a divorce proceeding, a trial court must classify property as either marital or separate and then award each spouse his or her separate assets. R.C. 3105.171(B),(D). Marital property includes "all real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i). R.C. 3105.171(A)(6)(a) describes separate property, stating, in pertinent part:
 "Separate property" means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:
 * * *
 (ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;
 (iii) Passive income and appreciation acquired from separate property by one spouse during the marriage[.] *Page 16 
 {¶ 30} In addition, "[t]he commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). Therefore, traceability is the main issue in determining whether separate property has become marital property due to commingling. Earnest v. Earnest, 151 Ohio App.3d 682,2003-Ohio-704, ¶ 38, citing Peck v. Peck (1994), 96 Ohio App.3d 731,734. Further, "the party seeking to establish an asset as separate property * * * has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property." Id.
 {¶ 31} Separate property may also be converted to marital property by inter vivos gift. Helton v. Helton (1996), 114 Ohio App.3d 683, 685. The elements of an inter vivos gift are "`(1) an intention on the part of the donor to transfer the title and right of possession of the particular property to the donee then and there and (2), in pursuance of such intention, a delivery by the donor to the donee of the subject-matter of the gift to the extent practicable or possible, considering its nature, with relinquishment of ownership, dominion and control over it.'" Id. at 685-686, quoting Bolles v. Toledo TrustCo. (1936), 132 Ohio St. 21, syllabus. Additionally, "`[a]n inter vivos gift is an immediate, voluntary, gratuitous and irrevocable transfer of property by a competent donor to another.'" Helton,114 Ohio App.3d at 685-686, quoting Smith v. Shafer (1993), 89 Ohio App.3d 181, *Page 17 
183. The party claiming an inter vivos gift bears the burden of showing by clear and convincing evidence that such a gift was made. Id.
 {¶ 32} Here, Betty asserts that the money used to fund the 2005 CD was the joint property of the parties, not Jeff's separate property. However, a review of the record indicates that testimony existed that the money used to fund the 2005 CD was derived from the 2002 CD and a tax refund received by Jeff prior to the marriage; that the 2002 CD was funded with Jeff's insurance settlement and another tax refund received prior to the marriage; and, that the 2005 CD was established prior to the marriage. Additionally, testimony existed that the 2003 CD, which was established by Betty with her insurance proceeds, was withdrawn and depleted prior to the marriage. Although Jeffs testimony contradicted Betty's testimony, we cannot say that the trial court's determination that the 2005 CD was Jeffs separate property was against the manifest weight of the evidence, particularly given that the trial court is in the best position to weigh the credibility of the testimony. Here, the trial court chose to believe Jeffs version of events rather than those proposed by Betty.
 {¶ 33} Additionally, Betty argues that she has an interest in the proceeds of Jeffs tax refunds because Jeff claimed her and her children as dependents. However, Betty cites no authority supporting this contention, and, further, *Page 18 
testimony existed that Jeff supported Betty and her children, and thus, was legally entitled to claim them as dependents.
 {¶ 34} Further, Betty argues that the parties' conduct indicates that Jeff made an inter vivos gift to her of the funds in the MCCU accounts, making the 2002 CD their "joint" funds. However, Betty did not argue at trial or in her original complaint that Jeff intended to make a gift to her by transferring his separate funds into the account and presented no evidence on the matter. It is axiomatic that a defendant may not assert an issue for the first time on appeal. See Shover v. Cordis Corp.
(1991), 61 Ohio St.3d 213, 219, overruled on other grounds byCollins v. Sotka (1998), 81 Ohio St.3d 506. Thus, because Betty did not argue at trial that Jeff made a gift of the 2002 CD or 2005 CD to her, she is precluded from asserting this argument on appeal. Moreover, testimony existed that funds in the share account could be removed by either party without the other party's approval. This characteristic of the account shows that the funds, once deposited by Jeff, were revocable by him, and he did not relinquish his dominion, control, or ownership of them. Therefore, all of the elements of an inter vivos gift were not present.
 {¶ 35} Accordingly, we overrule Betty's first assignment of error.
 Assignment of Error No. II *Page 19 {¶ 36} In her second assignment of error, Betty argues that the trial court erred in determining that the residence was the sole premarital property of Jeff Specifically, Betty claims that she made the down payment on the residence using her 1995 income tax refund and an insurance settlement; that the parties made mortgage payments with funds from the share account; and, that she worked to improve and maintain the property. We disagree.
 {¶ 37} Marital property includes "all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." R.C. 3107.171(A)(3)(b)(iii). Therefore, "where either or both spouses expend time and effort in improvements, both spouses are entitled to share in the appreciation on the separate property, as the appreciation is marital property." Welsh-Pojman v. Pojman, 3d Dist. No. 3-03-12,2003-Ohio-6708, ¶ 16, citing R.C. 3107.171(A)(3)(b)(iii); Guziak v.Guziak (1992), 80 Ohio App.3d 805; Men v. Men (1993),86 Ohio App.3d 199. However, "[p]assive income and appreciation acquired from separate property by one spouse during the marriage" remains separate property. R.C. 3105.171(A)(6)(a)(iii). Passive income is "[a]ppreciation that results from an increase in the fair market value of separate property due to its location or inflation[.] * * *" Henley v. Henley, 9th Dist. No. 05CA0053, 2006-Ohio-3336, ¶ 11 (citations omitted). *Page 20 
 {¶ 38} A review of the record indicates that testimony existed that Jeff acquired the residence prior to the marriage; that the deed to the residence and all mortgages were in Jeff's name only; that Jeffs money was used to make the down payment on the residence; that Jeff made all mortgage payments on the residence; that Jeff refinanced the residence and used surplus proceeds to improve the residence; that Betty never contributed financially to the mortgage payments or improvement of the residence; and, that Betty was earning only $100 a year and receiving little, if any, child support. Additionally, although Betty argues that she put "a lot of hard work" into improving the residence, she presented no evidence that her efforts at improving the residence increased its value. In fact, testimony existed that the amount owed on the residence exceeds its value. We note that Betty's testimony regarding the down payment and mortgage payments on the residence conflicted with Jeff's testimony; however, the trial court chose to believe Jeff's version of events, specifically stating that Betty's documentation and corroboration evidence supporting her claim were not credible. Thus, we find that the trial court's finding that the residence was Jeff's separate property was not against the manifest weight of the evidence.
 {¶ 39} Accordingly, we overrule Betty's second assignment of error.
 Assignment of Error No. III *Page 21 {¶ 40} In her third assignment of error, Betty argues that the trial court erred in finding that the vehicles were the sole premarital property of Jeff Specifically, Betty claims that the vehicles were paid for with joint funds and were used jointly, making them marital property. We disagree.
 {¶ 41} Initially, we note that Betty does not state which specific vehicles she claims are marital property. At trial, Betty requested only the 1998 Ford Ranger, 1993 Oldsmobile van, and recreational vehicles. Additionally, the trial court awarded Betty the 1996 Ford Taurus, 1993 Oldsmobile van, and two recreational vehicles in the divorce decree. Therefore, we presume that Betty claims only the 1998 Ford Ranger as marital property.
 {¶ 42} A review of the record indicates that testimony existed that the 1998 Ford Ranger was purchased by Jeff prior to the marriage and is titled in his name. Additionally, Betty presented no evidence suggesting that the Ranger was a gift to her, that it was purchased with her funds, or that she used it during the marriage. Further, although Betty claims that she is entitled to the Ranger because it was purchased with surplus funds from the refinancing of the residence, the residence was Jeffs separate property and he refinanced the residence and purchased the Ranger prior to the marriage. Therefore, the surplus funds were Jeffs separate property and, consequently, the Ranger was also his separate property. Thus, we *Page 22 
find that the trial court's finding that the vehicle at issue was Jeffs separate property was not against the manifest weight of the evidence.
 {¶ 43} Accordingly, we overrule Betty's third assignment of error.
 {¶ 44} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 SHAW and WILLAMOWSKI, JJ., concur
[1] Despite extensive testimony presented at the hearing concerning this loan and vehicle, we note that the trial court did not dispose of the vehicle in the Judgment Entry Decree of Divorce, stating that the car was destroyed prior to the marriage and it was unclear whether any insurance proceeds had been received. Given that Betty does not claim an interest in the vehicle or any insurance proceeds from the vehicle, we will not consider this vehicle in our discussion of Betty's third assignment of error.
[2] Although common law marriage has been abolished by the General Assembly, we note that, pursuant to R.C. 3105.171(A)(2)(b),(G), trial courts may, in determining what constitutes "during the marriage," find that the date of the marriage and/or the date of the final hearing are inequitable for purposes of determining marital property. If such a finding is made, the trial court may select dates that it considers to be equitable. See Flick v. Flick, 12th Dist. No. CA2001-05-111, 2001-Ohio-8673; D'Hue v. D'Hue, 8th Dist. No. 81017, 2002-Ohio-5857, ¶¶ 81-90. Therefore, a trial court may find it equitable to treat a premarital relationship with cohabitation and pooled resources as the beginning of the marriage for purposes of determining marital property. However, given that the trial court chose not to do so here and that neither party raised the issue, we will not address the issue.
[3] We note that the parties owned numerous cars, trucks, and recreational vehicles; however, Betty only asserted an interest in the 1998 Ford Ranger, 1993 Oldsmobile van, and recreational vehicles at trial. *Page 1