[Cite as *Reed v. Reed*, 2010-Ohio-4550.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

PETER W. REED,

    PLAINTIFF-APPELLEE,             CASE NO. 1-09-63

    v.

SUSAN B. REED,                    O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Allen County Common Pleas Court
Domestic Relations Division
Trial Court No. DR-2008-0691

**Judgment Affirmed**

Date of Decision:   September 27, 2010


APPEARANCES:

    *Douglas B. Dougherty* and *Michael J. Malone* for Appellant

    *James C. King*  for Appellee

**SHAW, J.**

{¶1} Appellant Susan B. Reed ("Susan") appeals the October 1, 2009 judgment of the Allen County Court of Common Pleas allocating a marital and a non-marital percentage to two investment accounts owned by Appellee Peter W. Reed ("Peter") and concluding that Peter met his burden in tracing a significant portion of these accounts to his separate property.

{¶2} The parties were married on March 31, 1991. No children were born from their union. Both parties had acquired a substantial amount of separate property prior to their marriage. At the time of the marriage, Peter was employed as a Radiologist. Peter began his career in Lima in 1965, retiring in 1999. Prior to the marriage, Susan was employed as a registered nurse, a career she began 1968. Shortly after the parties married, they agreed that it would be more conducive to their lifestyle for Susan to quit her job. For the duration of their marriage, Susan was not employed outside the home.

{¶3} On November 13, 2008, Peter filed for divorce. On December 17, 2008, Susan filed her answer and a counterclaim. The primary contention in the divorce proceedings focused on the division of the parties' separate and marital property. Specifically at issue were six investment accounts owned by Peter prior to the parties' marriage. Even though Peter established these accounts before marrying Susan, he periodically made contributions to some of the accounts while

they were married. Peter acknowledged that some marital funds were deposited in the accounts. However, Peter also maintained that these accounts retained a considerable non-marital component that could be traced to his separate property held before the marriage. Both parties conducted extensive discovery regarding these accounts.

{¶4} On June 22 and 23, 2009, the trial court held the final divorce hearing. Both parties offered expert testimony regarding the traceability of these accounts to Peter's pre-marital property. Peter and Susan also took the stand to testify on their own behalves. At the close of the evidence, the court asked the parties to submit their respective written arguments by July 8, 2009.

{¶5} On October 1, 2009, the court issued a sixteen-page decision. With respect to the investment accounts, the court found that Peter met his burden in tracing a significant amount of the assets to his separately held property. The court then allocated a marital and a non-marital component to these accounts accordingly. Susan contended that Peter did not sufficiently trace the assets held in the two largest accounts to his separately held property. As a result, Susan filed this appeal with the following assignments of error.

## ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED IN ITS DIVISION OF THE ASSETS CONTAINED IN THE HUSBAND'S UBS ACCOUNT BECAUSE IT ERRONEOUSLY ANALYZED TWO SEPARATE PROPERTY ISSUES.**

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED IN ITS DIVISION OF THE ASSETS CONTAINED IN THE HUSBAND'S J.P. MORGAN CHASE ACCOUNTS BECAUSE IT ERRONEOUSLY ANALYZED TWO SEPARATE PROPERTY ISSUES.**

**{¶6}** Because both of Susan's assignments of error address the trial court's decision to classify a significant portion of the two investment accounts in dispute as Peter's separate property, we elect to discuss them together.

**{¶7}** This Court reviews the trial court's classification of property as marital or separate property under a manifest weight of the evidence standard. *Gibson v. Gibson*, 3rd Dist. No. 9-07-06, 2007-Ohio-6965, at ¶26, quoting *Eggeman v. Eggeman*, 3rd Dist. No. 2-04-06, 2004-Ohio-6050, ¶14, citing *Henderson v. Henderson*, 3rd Dist. No. 10-01-17, 2002-Ohio-2720, ¶28. Accordingly, the trial court's judgment will not be reversed as being against the manifest weight of the evidence if the court's judgment is supported by some competent, credible evidence. *Barkley v. Barkley*, 119 Ohio App.3d 155, 159, 694 N.E.2d 989. "This highly deferential standard of review permits the affirmation of the trial court's judgment if there is even 'some' evidence to support the court's finding." *Huelskamp v. Huelskamp*, 185 Ohio App.3d 611, 620, 2009-Ohio-6864, ¶15, 925 N.E.2d 167 citing *DeWitt v. DeWitt*, 3rd Dist. No. 9-02-42, 2003-Ohio-851, ¶10.

**{¶8}** In a divorce proceeding, the trial court must determine whether property is marital or separate property. *Gibson v. Gibson*, 3rd Dist. No. 9-07-06, 2007-Ohio-6965, ¶ 29 citing R.C. 3105.171(B), (D). Marital property includes property that is currently owned by either or both spouses and that was acquired by either or both of the spouses during the marriage. See R.C. 3105.171(A)(3)(a). Property acquired during a marriage is presumed to be marital property unless it can be shown to be separate. *Huelskamp*, 185 Ohio App.3d at 619, 2009-Ohio-6864, ¶15, 694 N.E.2d 989.

**{¶9}** Separate property is statutorily defined by R.C. 3105.171(A)(6)(a) in the following manner:

> **'Separate property' means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:**
>
> **(i)   An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;**
>
> **(ii)  *Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;***
>
> **(iii) *Passive income and appreciation acquired from separate property by one spouse during the marriage;***
>
> **(iv)  Any real or personal property or interest in real or personal property acquired by one spouse after a decree of legal separation issued under section 3105.17 of the Revised Code;**
>
> **(v)   Any real or personal property or interest in real or personal property that is excluded by a valid antenuptial agreement;**

**(vi) Compensation to a spouse for the spouse's personal injury, except for loss of marital earnings and compensation for expenses paid from marital assets;**

**(vii) Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.**

R.C. 3105.171(A)(6)(a). (Emphasis added).

**{¶10}** The statute further states that "the commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). Thus, traceability is the key to determining whether separate property has lost its separate character after being commingled with marital property. *Ward v. Ward*, 3rd Dist. No. 01-03-63, 2004-Ohio-1390, ¶ 4 citing *Peck v. Peck* (1994), 96 Ohio App.3d 731, 734, 645 N.E.2d 1300. The party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property. *Peck*, 96 Ohio App.3d at 734. "Preponderance of the evidence means the greater weight of evidence that is necessary to destroy the equilibrium." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 102, 512 N.E. 2d 598. It is that proof which leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *Id.*

{¶11} Because Peter maintained during the divorce proceedings that the two investment accounts at issue contained a substantial separate property component, Peter had the burden to prove, by a preponderance of the evidence, that the disputed portions of the accounts could be traced to Peter's separate property. In attempting to meet this burden, Peter engaged the services of Jared Walsh, a licensed CPA.

{¶12} Walsh testified that he used the same methodology to analyze each of the original six accounts in contention at the divorce proceedings—including the two disputed on appeal. Walsh gathered data from his interviews with Peter. Peter also provided Walsh with a substantial amount of documentation associated with each of the accounts which included the statements issued from the banks or entities managing the funds. With respect to one of the accounts in question, Peter also kept a personal ledger. Peter testified that he used this ledger to record each transaction that resulted in the sale or acquisition of a new security. From these resources, Walsh reduced the voluminous amount of documentation into a detailed report. As part of his report, Walsh prepared spreadsheets that tracked the level of growth and decline of the accounts from the time of the parties' marriage in 1991 to the end of 2008 around the time this action was filed.

{¶13} Walsh's spreadsheets began with the pre-marital balance documented in 1991. In most cases, each statement generated from the managing

bank or entity during the duration of marriage was included in the spreadsheets associated with a particular account. Walsh used the information in the statements to apportion a marital and a non-marital component of the funds held in a particular account. Walsh tracked a running balance of the marital and the non-marital components of the account which he allocated into two distinct columns contained in his report labeled "marital balance" and "non-marital balance." If there was a deposit made into the account during the marriage, it was considered as part of the marital component of the account and added to the overall "marital balance." If Walsh could trace the origins of particular account funds to Peter's pre-marital property, the funds were added to the "non-marital balance."

{¶14} Walsh also used these statements to calculate a rate of return. Walsh testified that deposits as well as withdrawals on the accounts were included in the rate of return. The rate of return was calculated according to the frequency of the statements. Therefore, a rate of return would reflect the respective growth or decline according to a monthly or quarterly interval—depending on what the statement associated with that particular account stated. Once Walsh calculated the rate of return for that statement period, he then apportioned the rate between the marital and non-marital balances.

{¶15} As stated above, Walsh used this methodology to trace Peter's separate property in the two investment accounts at issue in this case: (1) X-Ray,

Inc. pension rollover accounts and (2) the UBS account, formerly McDonald's and Company Securities account. According to the testimony at the divorce proceedings, both of these accounts were funded with cash or cash equivalents.

*X-Ray, Inc. Pension Rollover Accounts*

{¶16} Peter testified that he began his career in Lima as a Radiologist in 1965. From that time until his retirement in 1999, Peter worked for X-Ray, Inc., a professional corporation comprised of physicians employed in the field of Radiology. In 1978, thirteen years before the parties' married, Peter began participating in a pension fund established by X-Ray, Inc. The fund permitted the participants to contribute up to $30,000 annually into the account. Peter testified that from 1978 until 1996, he contributed $30,000 a year into the pension fund. The pension fund was managed by a secession of banks throughout the years. On July 31, 1999, Peter rolled over the pension fund into two IRAs managed by Bank One and eventually Bank One's successor JP Morgan.

{¶17} With respect to the X-Ray, Inc. account, Peter provided Walsh with all but five of the monthly statements generated by the managing banks from November 1, 1991 to December 31, 2008. The statements reflected that Peter made an annual contribution of $30,000 in the years of 1992, 1993, 1994, 1995, and 1996. The statements indicated that no further deposits were made into the X-Ray, Inc. pension fund during the marriage. Walsh also testified that the

statements reflected that Peter began making withdrawals in 1999 when Peter attained the age of seventy and a half—the age of which Peter was required by law to begin making withdrawals on the retirement account. Even though these withdrawals were consumed during the marriage, Walsh included them in the periodic rate of return which was applied to both the marital and non-marital balances.

{¶18} Walsh tracked the pension fund to a pre-marital balance of $955,425.81 based on a statement dated November 1, 1991. At the end of 2008, the X-Ray, Inc. account contained a total amount of $1,105,707.50. Using the monthly statement balance and the periodic rate of return reflected in each statement, Walsh determined that the X-Ray, Inc. account had a marital component of $127,894.91 (approximately 11.57%) and a non-marital component of $977,812.59 (approximately 88.43%).

{¶19} Based on the evidence presented at the final divorce hearing, the trial court concluded that Peter met his burden in proving, by a preponderance of the evidence, that a substantial portion of the X-Ray, Inc. account could be traced to his separately held property. However, the trial court found that Peter's testimony established that he made a $30,000 contribution to the account every year from 1978 until 1996. Therefore, the evidence supported a finding that a $30,000

contribution was made in 1991 even though there was no statement submitted into evidence from that year documenting such a contribution.

**{¶20}** The trial court apportioned the 1991 $30,000 contribution between the marital and non-marital balances according to the parties' marriage date of March 31, 1991. Thus, three-quarters ($22,500) of the contribution was added to the marital balance and the remaining quarter ($7,500) was added to the non-marital balance. Applying the applicable rate of return for the 1991 contribution, the trial court found that an additional $38,334 should be included in the overall marital balance of the X-Ray, Inc. account. The court then modified Walsh's conclusions accordingly and found that 13.7% of the X-Ray, Inc. account was marital and 86.3% was non-marital.

**{¶21}** The trial court then ordered that the X-Ray, Inc. account be divided among the parties in those percentages as of June 22, 2009—the date of the parties' divorce. Peter received the non-marital percentage plus half of the marital percentage for a total of 93.15%. Susan received half of the marital percentage for a total of 6.85%.

*UBS Account*

**{¶22}** The testimony at the final hearing revealed that Peter held a stock and bond brokerage account with McDonald and Company Securities. This account was eventually transferred to be under the management of UBS. Over the

course of the years, Peter purchased and sold many stocks and bonds. Peter kept a contemporaneous ledger ("log book") in which he recorded the securities that he purchased and sold. In the log book, Peter recorded the purchase price per unit, the money he received upon a sale, the brokerage commission, and the capital gains accrued for tax purposes. Peter's handwritten log book begins in 1969 and tracks the transfer of specific securities until the account is transferred to UBS sometime between 2006 and 2008. During the parties' marriage, Peter deposited some of these securities into the UBS account. Peter maintained that some of these deposits could be traced to his separate property purchased before the marriage and offered Walsh's testimony to prove this point.

{¶23} Walsh testified that he used Peter's log book, brokerage slips and UBS/McDonald account statements to determine if Peter acquired a particular security held in the account prior to the parties' marriage. Peter provided Walsh with every statement for the account generated by the managing entity during the parties' eighteen-year marriage. Walsh considered all cash deposits made into the account during the marriage as marital deposits which he added to the "marital balance." Walsh further explained his method of tracing for the particular transfers of securities contained in the UBS account in the following manner:

> **I started with the statement, if it showed a transfer in of securities, I would then refer back to the securities log book. If the transfer in of securities was able to be traced to the securities log book it may have been . . .it may have been in the log book as**

> **purchased before March of [19]91, or it may have been in the log book as purchased after March of [19]91. If it was before and I could trace it to the log book I would include that deposit in the non-marital column. It if was after and I could trace it to the log book after March of [19]91, I would put it in the marital column. If it wasn't able to be found in the log book at all, I would put it in the marital column.**

(Hrg. Trans., June 22, 2006, at 91).

**{¶24}** Walsh testified that Peter also provided him with brokerage slips reflecting the deposit of a particular security into the UBS account. Based on the brokerage slips, Peter's log book and the UBS account statements, Walsh testified that he was able to identify whether a specific security held in the UBS brokerage account was Peter's pre-marital property that was later deposited into the UBS account during the marriage. As Walsh stated above, the only contributions to the account that he considered to be non-marital were the ones that he could trace to a pre-marital purchase date using these resources. Walsh included all other deposits into the account during the marriage as part of the marital balance.

**{¶25}** Walsh further testified that he used the same method in calculating the periodic rate of return as he did for the other accounts. In this instance, Walsh used the quarterly account statements issued by the managing entity to determine the periodic rate of return. Further, any withdrawals made on the account during the marriage were included in the periodic rate of return. Walsh applied the periodic rate of return to both the marital and non-marital balances.

{¶26} Walsh established that the UBS account had a pre-marital balance of $58,518.03 based on a statement dated March 28, 1991—three days before the parties married. As of December 31, 2008, the account had a balance of $613,032.14. Based on the methodology previously described, Walsh traced several substantial deposits into the UBS account to property Peter acquired prior to the parties' marriage. Walsh concluded that the UBS account contained a marital component of 53.17% and a non-marital component of 46.83%.

{¶27} The trial court found that Peter had also met his burden in tracing his separate property in the UBS account and accepted Walsh's conclusions as the percentages allocating marital and separate components of the UBS account. The trial court then ordered Susan to receive one-half of the marital component (26.83%) and ordered Peter to receiving the remaining portion of the account (73.17%) as of June 22, 2009—the date of the parties' divorce.

## *Appeal*

{¶28} Susan now claims on appeal that the trial court erred when it found that Peter met his burden in proving that a portion of these accounts remained Peter's separate property. Specifically, Susan contends that Peter failed to sufficiently trace his separate property held in these accounts. Susan also maintains that Peter failed to prove that the appreciation and income generated from assets in these accounts were caused by solely passive factors.

{¶29} In making this claim, Susan directs our review to our prior case law. In reviewing these cases, we note that the factual basis for the trial court's ruling in these decisions is readily distinguishable from the case at hand. Specifically, in the cases cited by Susan, the party asserting that a particular asset remained separate property provided either no evidence or incomplete evidence to support the claim.[1] However, the present case is not plagued with the same lack of an evidentiary record as the cases Susan cites.

{¶30} On the contrary, Peter kept detailed records of the funds in these accounts which established that these accounts existed prior to the parties' marriage. Furthermore, from these statements both a pre-marital value and a value at the time of the divorce proceedings could be ascertained. Based on Peter's meticulous record keeping, Walsh was able to quantify a precise portion of the accounts as Peter's separate property. These records gave Walsh the necessary resources to calculate the percentage of the appreciation in the funds attributable to both Peter's separate property and the marital property contained in the accounts.

---

[1]For example, in *Schalk v. Schalk*, 3rd Dist. No. 13-07-13, 2008-Ohio-829, we held that the trial court did not err in finding that the appellant failed to meet his burden in establishing that shares of stock were his separate property where there was evidence to show that the stock was acquired *after* the parties marriage. Further, the appellant provided *no documents* to substantiate that the stock could be traced to his separate property. The only evidence presented was the appellant's own testimony which the trial court determined that alone, without more, was not sufficient to support appellant's contention that the stock was his separate property. Likewise, *Ward v. Ward*, 3rd Dist. No. 01-03-63, 2004-Ohio-1390, we upheld the trial court's finding that the appellant failed to meet his burden in establishing that a savings account was his separate property where the evidence showed that the balance of the account fluctuated throughout the marriage reflecting ongoing marital transactions. Additionally, the appellant in that case provided *no evidence nor made any attempt at the proceedings to trace* specific pre-marital deposits held in the account.

{¶31} The record is supported by an ample amount of evidence provided by Peter to prove that he could trace a significant portion of the X-Ray, Inc. and UBS accounts to property that he acquired prior to his marriage to Susan. Therefore, the evidentiary record in this case is greatly dissimilar from the cases cited by Susan where little or no evidence was in the record to support the party's contention that a particular asset retained a separate property component.

{¶32} Susan also takes issue with the particular method of tracing employed by Walsh in reaching his conclusions. Specifically, she maintains that Walsh failed to trace the actual pre-marital asset throughout the parties' marriage. In support of this contention, Susan again directs our review to case law.

{¶33} In *Sanor v. Sanor*, 7th Dist. No. 2001 CO 37, 2002-Ohio-5248, the Seventh District reversed the trial court's ruling that the husband sufficiently established that certain farm equipment was his separate property. The evidence showed that the husband was given farm equipment as a gift and was, therefore, his separate property. During the course of the marriage, the husband traded-in the equipment and applied the proceeds toward the purchase of new farm equipment. However, marital funds were used to pay the balance of the purchase price to buy the new equipment—clearly indicating that the proceeds of husband's separate property had been comingled with marital property. The appellate court held that the husband did not establish that the new equipment was his separate

property because the *husband failed to provide any information* indicating what percentage of the proceeds from the sale/trade-in of his separate property were contributed to the purchase of the new equipment.[2]

{¶34} The present case is readily distinguishable from the case law cited by Susan. Here, the assets in the X-Ray, Inc. and UBS accounts were not equipment that depreciated over time and were eventually replaced with new assets partially purchased with marital funds. Rather, the assets in Peter's accounts were cash or cash equivalents and therefore easily quantifiable. Based on the extensive records kept by Peter, Walsh was able to calculate the percentages of money held in the X-Ray, Inc. and UBS accounts which constituted Peter's separate property held prior to the parties' marriage.

{¶35} Susan also argues that Peter failed to sufficiently trace the appreciation in the X-Ray, Inc. and the UBS accounts to his separate property. Specifically, Susan maintains that Walsh's method of calculating the rate of return was flawed. Susan alleges that Walsh improperly used the "average rate of return" instead of the "actual rate of return." Susan cites *Mays v. Mays*, 2nd Dist. No.

---

[2] Susan also cites *Balogh v. Balogh* (1995), 11th Dist. No. 94-P-0099 in support of her claim that Walsh did not sufficiently trace the actual pre-marital assets in the X-Ray, Inc. and UBS accounts. In *Balogh*, the husband established that he owned three trucks and one trailer prior to the marriage which he used in his trucking business. After the parties married, the wife quit her job and began working for her husband's trucking business. During the course of the Baloghs' fifteen-year marriage, the trucks that were originally the husband's separate property had been traded-in and replaced with upgraded models which were also partially purchased with marital funds. As in *Sanor*, the appellate court reversed the trial court's ruling that the husband met his burden in establishing the trucks and trailer were his separate property because husband did not quantify what percentage of the proceeds from his separate property were contributed to the purchase of the new trucks and trailer acquired during the marriage.

2000-CA-54, 2001-Ohio-1450 as authority that Walsh used an impropriate rate of return in his calculations.

{¶36} In *Mays*, the husband owned an IRA prior to the parties' marriage. Shortly after the parties married, the husband rolled over the IRA funds into an investment account. As in the present case, the husband maintained that the pre-marital value of the investment account and any passive income attributed to the pre-marital amount remained his separate property. The husband hired a CPA who concluded that a specific portion of the investment could be traced to the husband's separate property.

{¶37} The CPA testified that, despite having the actual rates of return available to him, he used a ten-year "average rate of return" to calculate the income growth of the account for ten out of the thirteen years the parties were married. The CPA then used a one year rate of return with respect to each of the three remaining years of the marriage. The Second District was particularly concerned with the CPA's method because he chose to use "hypothetical numbers" instead of the actual numbers which were readily available to him in reaching his conclusions. *Mays*, 2nd Dist. No. 2000-CA-54, *5, 2001-Ohio-1450. The appellate court remanded the case to the trial court with instructions that the actual rates of return be used to determine the passive income attributable to the husband's separate property.

{¶38} Contrary to Susan's assertion, Walsh's method of calculating the rate of return differs significantly from method used in the *Mays* case. As stated above, Walsh testified that he used the statements issued from the managing bank or entity associated with the accounts that were generated on either a monthly or quarterly basis. Based on the actual numbers listed in the statements, Walsh calculated the rate of return for the respective month or quarter reflected in the statement. Unlike in the *Mays* case, there was no evidence before the court that Walsh declined to use the actual numbers in favor of using hypothetical figures. Therefore, we find no error in the trial court's decision to accept Walsh's calculation of the rate of return as a valid method.

{¶39} Susan alternatively argues that Peter failed to prove that the appreciation in the accounts constituted passive income and, therefore his separate property, because he did not prove that the appreciation resulted from solely passive factors. The statutory definition of separate property includes "[p]assive income and appreciation acquired from separate property by one spouse during the marriage." R.C. 3105.171(A)(6)(a)(iii). Passive income is further defined as "income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse." R.C. 3105.171(A)(4).

{¶40} On appeal, Susan insinuates that Peter actively monitored and managed the accounts which resulted in an "active" appreciation of the funds held

in the X-Ray, Inc. and the UBS accounts and, therefore, should be considered marital property. After reviewing the record before us it is apparent that Peter engaged in the following activities with regard to monitoring and managing the funds in the accounts in question: Peter kept a contemporaneous log book of his stocks and bonds; Peter periodically called his stock broker to discuss his portfolio; and Peter read financial literature and watched television programs focusing on financial matters.

{¶41} At the hearing on the divorce proceedings, Peter admitted that he viewed investing as an "interest" but further stated in response to questioning by Susan's counsel that it was not a "second career." Moreover, the record provides no evidence that Peter aggressively "played the market" and took extreme risks which resulted in a roller coaster of losses and returns.[3] Rather, the record revealed that Peter used a simple, conservative approach maintaining the level of growth of the investments that he had spent his career building and which now

---

[3] See *Hanna v. Hanna*, 6th Dist. No.L-01-1446, 2003-Ohio-1401 (The record revealed evidence that the husband actively "played" the stock market causing extreme fluctuations of the balance in the disputed brokerage account. The court held that the husband's active management of the account constituted "labor" within the meaning of R.C. 31015.171(A)(3)(a)(iii) because the husband routinely made aggressive purchases and sales of stocks which resulted in great losses that depreciated the account balance to below the pre-marital balance. Husband then reinvested marital funds to raise the account to the divorce balance which was substantially higher than the pre-marital balance. Based on the evidence, the court ruled the appreciation was marital property.). See, also, *Bryant v. Bryant* (1999), 5th Dist. No. 97CA8, 98CA1, (holding that the disputed accounts did not represent passive income and appreciation, but rather, were the result of the investment of marital funds and labor expended on those accounts during the marriage. As in *Hanna,* the evidence showed that the account balance fell below the pre-marital balance as a result of the parties' transaction activity on the account during the marriage. The balance was subsequently raised with the reinvestment of marital funds and active management of the account).

provided him with a means of support during his retirement. Consequently, the trial court was not persuaded by Susan's assertion that Peter's activities with regard to these investment accounts amounted to a labor, monetary, or in-kind contribution resulting "active" income. Accordingly, we also find no error in the trial court's conclusion that the appreciation attributable to Peter's pre-marital property was passive income and remained Peter's separate property.

{¶42} Based on the foregoing, we find that there was ample competent, credible evidence before the trial court to conclude that Peter met his burden in proving, by the preponderance of the evidence, that a significant portion of the X-Ray, Inc. and UBS accounts could be traced to his separate property. Therefore, we find no error in the trial court's decision that Peter sufficiently traced a quantifiable component of these accounts to his separate property.

{¶43} For all of these reasons, the assignments of error overruled. The judgment of the Allen County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**ROGERS and PRESTON, J.J., concur.**

**/jlr**