[Cite as *Stewart v. Stewart*, 2025-Ohio-1635.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

REBECCA L. STEWART,                    :          APPEAL NO.   C-240350
                                                 TRIAL NO.    DR-2200237
    Plaintiff-Appellee,          :

  vs.                                  :
                                                      *JUDGMENT ENTRY*

THOMAS B. STEWART,                     :

    Defendant-Appellant.         :


This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 5/7/2025 per order of the court.**


**By:**_____
       **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


REBECCA L. STEWART,                 :          APPEAL NO.   C-240350
                                               TRIAL NO.    DR-2200237
          Plaintiff-Appellee,       :

     vs.                            :

                                               *O P I N I O N*
THOMAS B. STEWART,                  :

          Defendant-Appellant.      :



Appeal From: Hamilton County Court of Common Pleas, Domestic Relations
             Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 7, 2025


*Keating Muething & Klekamp, PLL*, *Kellan H. Coffey* and *Bryce J. Yoder*, for Plaintiff-
Appellee,

*Cornetet, Meyer, Rush & Spillane* and *Karen P. Meyer*, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

**{¶1}** Defendant-appellant Thomas B. Stewart ("husband") appeals from the final judgment and decree of divorce from plaintiff-appellee Rebecca L. Stewart ("wife") issued by the Hamilton County Court of Common Pleas, Domestic Relations Division. He raises four assignments of error, challenging four specific property awards by the trial court. For the reasons that follow, we affirm the judgment of the trial court.

## I.    *Factual and Procedural History*

**{¶2}** Wife and husband each filed for divorce. The property issues proceeded to a two-day trial before the magistrate on July 19 and August 16, 2023. Wife presented her own testimony, as well as the testimony of a real estate appraiser and her attorney (for purposes of fees). Husband presented his own testimony, plus the testimony of a real estate appraiser. Both parties also submitted numerous exhibits.

**{¶3}** On November 29, 2023, the magistrate entered an order on all issues except the merits utilizing a de facto termination date of December 31, 2022. Relevant to this appeal, the magistrate awarded husband the real property located at 2333 and 2325 Sherman-Newtown Road ("the Farm"), including the house, trailer, and barns associated with the property at the time of transfer as well as the residential home built on the property in 2019. Additionally, the magistrate awarded wife the 2018 Toyota Highlander and awarded husband the 2001 Mercedes-Benz CLK430, the 1998 Chevrolet pickup, the 2002 Harley Davidson Dyna Motorcycle, the 1964 Triumph Tiger T100SC motorcycle, and the 2010 Polaris Sportsman 550 UTV. Further, the magistrate awarded wife $63,112.76 for "inequitable disposition of marital assets post-filing" by husband. Lastly, the magistrate awarded wife $35,612.65 by way of a property equalization payment for her portion of the equity in the parties' divisible

traveler points.

**{¶4}** Both husband and wife filed objections to the magistrate's decision. Relevant to this appeal, husband raised four objections to the magistrate's decision that are substantially similar to the issues now raised here on appeal that relate to the four above-mentioned awards. The trial court overruled the objections and "affirmed" the magistrate's decision on April 12, 2024.

**{¶5}** A final merits hearing was held before the magistrate by consent of the parties on May 13, 2024, and a final decree of divorce was ultimately entered on May 20, 2024, which fully incorporated the magistrate's November 29, 2023 decision. Husband now appeals, raising four assignments of error for this court's review related to the four above-mentioned awards.

## II. *Analysis*

**{¶6}** In a divorce proceeding, the trial court must "determine what constitutes marital property and what constitutes separate property," and then "shall divide the marital property and separate property equitably between the spouses" in accordance with R.C. 3105.171. R.C. 3105.171(B). "The statute requires an equal distribution of marital property unless an equal division would be inequitable." *Devito v. Devito*, 2024-Ohio-2234, ¶ 13 (1st Dist.), citing R.C. 3105.171(C)(1). "In making a division of marital property, the court shall consider all relevant factors, including those set forth in [R.C. 3105.171(F)]." R.C. 3105.171(C)(1).

**{¶7}** In other words, "there is no one-size-fits-all formula for fashioning an equitable division of property." *Edje v. Holmes*, 2024-Ohio-1663, ¶ 15 (1st Dist.), citing *Berish v. Berish*, 69 Ohio St.2d 318, 321 (1982). "Therefore, in divorce cases, [this court] afford[s] deference to the lower court as it 'fulfill[s] its weighty responsibility [and] resolv[es] the property issues based on the relevant facts and

circumstances of each unique case.'" *Id.*, citing *Stapleton v. Stapleton*, 2022-Ohio-3018, ¶ 27 (1st Dist.).

{**¶8**} So, as a general matter, "'[t]his court reviews "the manner in which a domestic-relations court executes an equitable division of property for an abuse of discretion."'" *Tyra v. Tyra*, 2022-Ohio-2504, ¶ 11 (1st Dist.), citing *Boolchand v. Boolchand*, 2020-Ohio-6951, ¶ 9 (1st Dist.). "An abuse of discretion occurs when a court exercises its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." (Cleaned up.) *Mallory v. Mallory*, 2024-Ohio-5458, ¶ 13 (1st Dist.), citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 39.

{**¶9**} However, "[t]rial 'courts lack discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule.'" *Gadson v. Scott*, 2025-Ohio-7, ¶ 16 (8th Dist.), citing *Johnson* at ¶ 39. Thus, this court reviews "the trial court's adherence to R.C. 3105.171's statutory directives de novo." *Edje* at ¶ 14, citing *Stapleton* at ¶ 23.

{**¶10**} Further, factual issues, such as the classification and valuation of property, are reviewed under the sufficiency-and-weight-of-the-evidence standards. *Tyra* at ¶ 11, citing *McKenna v. McKenna*, 2019-Ohio-3807, ¶ 9 (1st Dist.). Sufficiency is a test of adequacy and looks to whether the evidence is legally sufficient as a matter of law. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Weight concerns "'the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other.'" (Emphasis deleted.) *Id.*, quoting *Thompkins* at 387.

{**¶11**} "In reviewing a weight of the evidence challenge, [this court] weigh[s] the evidence and all reasonable inferences, consider[s] the credibility of the witnesses, and determine[s] whether in resolving conflicts in the evidence, the trial court clearly

lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *McKenna* at ¶ 10, citing *In re A.B.*, 2015-Ohio-3247, ¶ 14 (1st Dist.).

## A. *First Assignment of Error*

{¶12} In the first assignment of error, husband argues that the trial court erred in adopting wife's appraisal of the Farm when determining the value of the property. A challenge to the valuation of property where the court had before it two competing expert appraisals is a challenge to the weight of the evidence. *See McKenna* at ¶ 10. Regarding the Farm, the magistrate made the following findings:

> [Husband] inherited [the Farm] during the course of the marriage. The [Farm] consists of rural land in the amount of 179 acres. No valuation at the time of the initial conveyance to [husband] of the referenced real property on July 3, 2003[,] was provided at [the] hearing of the matter. The parties provided a Joint Exhibit demonstrating that they had transferred the referenced real property into a trust on or about October 2, 2019; at this time, the total fair market value of the as-yet developed real estate was listed at $85,000. The parties subsequently built a house on this real estate in 2019 which was not utilized as a home address for either party; the parties agree that the house alone should be counted as a marital asset but left valuation of the residence to the Court.

> [Wife] asserted that the parties had made marital improvements to the property in addition to construction of the referenced house; these improvements allegedly made with marital assets included, but were not limited to, installation of a gravel driveway to the residence,

6

landscaping of the property, installation of a septic system with leach field, installation of geothermal environmental system and excavation of a pond associated with the house. The property was reported as being subject to no note or financial encumbrance at present. [Wife] requested that the residence be valued at $678,500.00 as per the report of her expert and that the parties share equally in the equity value of the property.

Ken Carroll testified on behalf of [wife] as an expert certified residential appraiser having appraised the house built on the farm property in 2019. Mr. Carroll confirmed that he personally conducted the appraisal of the referenced property. He noted that he valued the home using the structure itself plus eleven acres of real estate; due to the rural nature of the build site, significant tax breaks are available to individuals owning land in excess of ten acres (qualifying as a small farmstead). Mr. Carroll noted that the house could not be valued with less than one acre of land as the existence of the septic system and leach field would necessitate purchase of land in excess of one acre. He noted that the home was a custom-designed property that was not in a high-demand area; his valuation of the property (inclusive of 11 acres of real estate) was $115,000.00 for the site value plus $563,500.00 for the residential value totaling $678,500.00. When asked about the content of the competing valuation, Mr. Carroll indicated that he felt the approach utilized by [husband]'s appraiser was 'odd' and did not account for necessary land requirements and market value of the property in question.

7

[Husband] asserts that the farm was initially established by his great-great-grandfather and included barns, a family home and a trailer on the land; this party requested that he be awarded the farm free and clear of any interest on the part of [wife], acknowledging that she was entitled to a measure of the equity value on the new home built on the land in 2019.

Dale Crump testified on behalf of [husband] as an expert residential appraiser having appraised the house built on the farm property in 2019. Mr. Crump confirmed that he personally conducted the appraisal of the referenced property. He noted that he valued the home using a 'reasonable' half acre site and arrived at a value based upon the cost of construction of the residence rather than a market value approach. Mr. Crump confirmed the valuation of the property (inclusive of ½ acre of real estate) was $344,000.00 for the entirety of the subject property.

For purposes of the valuation of the home built on the farm property in 2019, the Court deems the report and analysis of Ken Carroll to be more credible in nature. The cost-based approach utilized by Dale Crump did not account for some three years' lapse in time between build and valuation of the residence, only accounted for part of the expenses associated with the construction of the home, did not account for the septic/leach field associated with the property and utterly omitted consideration as to the land and value of the driveway that would be required for an arms-length buyer to access the real estate. The value of the property shall be considered at the market/comparable amount

of $678.500.00.

**{¶13}** The trial court overruled husband's objection to the magistrate's decision on this issue, finding that the magistrate relied on the "credible testimony" of Mr. Carroll. The magistrate's decision was then fully incorporated into the final divorce decree.

**{¶14}** Husband argues that the valuation of the farm was in error as "the only marital asset that needed to be valued was the house that was built on the farm during the marriage," and wife's appraisal went beyond just the house and used inappropriate comparable sales. In doing so, he fails to point to any legal authority in support of his position. Rather, he simply suggests that wife's appraisal was not credible as no reason was given for the inclusion of 11 acres of land and the report used comparable sales that were "better developed" than the house built in 2019.

**{¶15}** Wife argues the trial court did not err in valuing the farm where the parties offered competing expert testimony and reports from certified property appraisers as to the value of the home and the trial court expressly found that Mr. Carroll offered the more credible valuation based on competing methodologies.

**{¶16}** As an initial matter, husband appears to argue that there was a specific agreement that only the house itself would be counted as a martial asset. However, the parties entered into certain trial stipulations prior to the start of trial, and nothing in these stipulations was relevant to this property. Thus, there is no indication in the record of any agreement as to what would be included for purposes of valuing this property. Consequently, while it seems the parties agreed that the home was marital property, the record does not show any agreement as to what would be included with the home for purposes of valuation.

**{¶17}** Wife's expert appraiser was Mr. Carroll. His report begins by stating,

The subject property consists of 95.9 acres, one house that is less than 2 years old, and an older farm house that was constructed in 1908. There are 2 older barns on the property that have minimal value. Per the instructions of [wife], I have divided a portion of the property that would reasonably be sold with the newer home, if the property were subdivided.

{¶18} The report then indicates that "a parcel was carved around the area of the subject improvement's foot print," and "[t]he property carved out included only the ridge upon which the house is built." It then states that, based upon a rough drawing, "the house and 11 acres seems to be a reasonable site size." It further said that another reason for the 11 acres was so that the property owner could take advantage of the tax break associated with a farm exemption. Consequently, the appraisal included the house and 11 acres, "with a deeded easement via the gravel drive back to the 11 acres area."

{¶19} Mr. Carroll testified at trial that he was "to appraise the home for market value and to assign it a site size that would. . . most likely accompany a home of that type. . . given the way that the land sat and what the amenities were[.]" He denied that wife told him what acreage to use. Rather, he said that his decision was based on his "professional opinion." When asked how he determined 11 acres, he said,

I know that the couple had about 200 acres. The way that the land sits and having a drive going back to the house, I had no idea who would end up with the house, if it would [be] the gentleman or if it would be the wife. Kentucky allows for anything over ten acres to have a tax break as a small farm, and that is very highly sought after in rural areas so that people can get that tax break. The house sitting on one acre, in

my opinion, would be very difficult to sell.

He also testified that it would not be typical for homes in that area to include only one acre "unless there were public utilities, and it was sitting closer to town."

**{¶20}** Beyond that, Mr. Carroll testified as to the differences that he considered in his report when comparing this house to the comparable sales that he used. For example, he considered that this home had a geothermal heating system—which is expensive and preferable over a home with a propane or electric furnace—and a pond. He also made adjustments based on differences such as gross living area, time of sale, age, and condition of the home, and different features. He expressly testified that he "made the different adjustments for the differences in the different homes." Further, he testified that this home was a custom build, and not a "builder design." Ultimately, he testified that his opinion as to the value of the home was $678,500. Of that price, $115,000 was attributable to the "site value," with the remainder attributable to the house itself.

**{¶21}** Further, when asked his opinion on using only a half acre when valuing the home, Mr. Carroll said, "It's –that's impossible. You just can't do that. The Department of health wouldn't allow that because of the leach lines and the septic, that sort of thing." He further opined that, even if the health department would allow it, people looking at the home would think half an acre was "absurd" because of how far back the home sits and try to offer to buy more land around it.

**{¶22}** Husband's expert appraiser, Mr. Crump, did testify as to a number of "errors" he believed Mr. Carroll made in his report regarding adjustments made when considering comparable sales. However, it was within the purview of the trial court to determine credibility when resolving evidentiary conflicts. *See Iranpour-Boroujeni v. Emami*, 2024-Ohio-2546, ¶ 94 (1st Dist.), citing *Kinnett v. Corporate Document*

*Solutions, Inc.*, 2019-Ohio-2025, ¶ 21 (1st Dist.) ("It is well established that 'the determination of witnesses' credibility and the resolution of conflicts in the evidence are matters for the trier of facts.'"); *Eastley*, 2012-Ohio-2179, ¶ 21, quoting *Seasons Coal Co. Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984) ("'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict or judgment."). The trial court expressly found that Mr. Carroll provided a more credible valuation.

{¶23} The most notable differences between the two appraisals were the acreage included and the type of appraisal (market value vs. cost).

{¶24} Mr. Crump's report explains that, at the request of the client, "the newly constructed residence will be carved out of the parent tract and sit on one half (1/2) acre tract with ingress and egress to the property." When asked at trial if a half acre was a reasonable amount of land for the house, Mr. Crump said,

> It could be. It's not uncommon in Grant county in a rural county. So, there are different parcels all over the board down there. You know, there are a lot of single-wide mobile homes, a lot of double-wide homes, and it's not uncommon for, you know, a child to put some type of trailer or a modular home on their parents' farm, and they do a carve out of whatever they want to do, yes.

{¶25} He was then asked if it was reasonable for this particular house, and he simply said "yes" without any further explanation. He later agreed on cross-examination that he used a half acre of land in his valuation because that is what husband told him to use. When questioned by the court, he denied that the half acre included the driveway to get to the home.

**{¶26}** Further, when discussing the value of the house, Mr. Crump said that "the value of the residence was taken from a contract from the contractor who had built the house for the client." He said, "And then what I did, is I found some land sales and applied the value of the land and added it to the value of that cost of the house, which was built new, and came up with a final opinion of value." He valued the half acre of land at $12,019, and "just rounded it to $12,000." He then added this to the "cost of the residence" and "came up with $344,000." As to the cost of the residence, the paperwork that he was given showed the cost at $331,923 and he "rounded it up" to $332,000. He did not use comparable sales for the value of the residence.

**{¶27}** When discussing the information he used to determine the cost, Mr. Crump said he had "a copy of what the contractor charged [husband], and [husband] had receipts that he could show [him]." On cross-examination, he agreed that his value was based only on information he was given from husband. More specifically, regarding his methodology, he was asked to confirm that he used land value for half an acre, plus "the cost to build the home as determined by information provided by and requests made by [husband]," and he said, "That's correct." Mr. Crump acknowledged in his testimony that the market had "gone up" between the time when the house was built and when he completed his report.

**{¶28}** Significantly, wife testified in response to Mr. Crump's testimony and said that the one-page letter from the contractor that Mr. Crump relied upon for his report for the value of the home "definitely" did not encompass everything involved in the cost to build and construct the property. She said, "aside from paying the builder, we bought several things directly, like appliances, cabinets for the laundry room, the kitchen, the bathroom, countertops that went with those all came from the same

13

supplier, light fixtures, other things that I may not be thinking of right now." She also added "landscape plants, that sort of thing," and the pond.

{¶29} Thus, the evidence supports the magistrate's finding that

> [t]he cost-based approach utilized by Dale Crump did not account for some three years' lapse in time between build and valuation of the residence, only accounted for part of the expenses associated with the construction of the home, did not account for the septic/leach field associated with the property and utterly omitted consideration as to the land and value of the driveway that would be required for an arms-length buyer to access the real estate.

{¶30} Based on this evidence, we cannot conclude that the trial court clearly lost its way and created a manifest miscarriage of justice by relying on the report and testimony of Mr. Carroll, rather than Mr. Crump. Consequently, we cannot say that the trial court's decision as to the valuation of the farm was against the manifest weight of the evidence. Therefore, we overrule the first assignment of error.

### B. Second Assignment of Error

{¶31} In the second assignment of error, husband argues that the trial court erred in using the values of the vehicles set forth by wife at the hearing, rather than the values of the vehicles set forth by wife in her initial property statement. The magistrate found that "[v]aluation of the vehicles in question shall be set at present third-party sale value of the vehicles." This was based on the magistrate's finding that "the present market value of the vehicles as presented by [wife] is more credible and shall serve for valuation of the vehicles for purposes of asset equalization." The trial court overruled husband's objection on this issue, finding that the values presented by wife in her property statement were "preliminary and were not substantially different

than the values presented by her a year and a half later at trial." The magistrate's decision was then fully incorporated into the final divorce decree.

**{¶32}** Husband argues that this valuation was in error as no explanation or evidence was given to support the change in value for the vehicles. In doing so, he fails to point to any legal authority in support of his position.

**{¶33}** Wife argues that the valuation was proper where the trial court determined that the vehicles should be valued by their present value as of the date of the hearing, and her property statement was submitted nearly a year and a half prior to the trial.

**{¶34}** "Prior to dividing a couples' property and debts, the trial court must determine the duration of the marriage by pinpointing the time period that will be considered 'during the marriage.'" *Owens v. Owens*, 2022-Ohio-3450, ¶ 18 (1st Dist.), citing *Elliot-Thomas v. Lewis*, 2019-Ohio-3870, ¶ 5 (9th Dist.). "'The term "during the marriage" is a term of art and is the period that is used to identify separate and marital property and debts and to value the couples' property and debt.'" *Id.*, citing *Elliot-Thomas* at ¶ 5. However, "[a]s an exercise of its discretion, the 'court may use alternative valuation dates to achieve the equitable distribution of marital assets.'" *Iranpour-Bouroujeni v. Emami*, 2024-Ohio-2546, ¶ 97 (1st Dist.).

**{¶35}** Here, the trial court determined that the de facto marriage termination date was December 31, 2022. At the hearing, the parties submitted competing evidence as to the value of the vehicles. Husband requested that the trial court utilize the current *trade-in value* of the vehicles, as set forth in his Exhibit U. On the other hand, wife requested that the court utilize the current *private party value* of the vehicles, as set forth in her Exhibit 30. Notably, there was no request by husband at the hearing for the trial court to use the values set forth in wife's initial property

statement. Further, he did not object to wife's evidence at the hearing.

**{¶36}** Now, husband argues that it was an abuse of discretion for the trial court to use the values set forth by wife at the hearing "with no evidence whatsoever to support why the values changed from her earlier sworn statement."

**{¶37}** Wife's initial property statement was filed on February 15, 2022, which was over ten months prior to the marriage termination date. Looking to the evidence presented at the hearing, the values submitted by both parties appear to be the value as of July 2023, which was at the time of trial and only seven months after the marriage termination date. No other values were submitted to the court for consideration that would pertain to December 2022, which was the marriage termination date, nor was any evidence offered as to the value of vehicles as of August 2022, which was the date that the parties physically separated and the date that husband argued should be the marriage termination date.

**{¶38}** Because no evidence of value was offered as of the marriage termination date and the evidence of value presented at the hearing was more close in time to the marriage termination date than wife's initial property statement, we cannot determine that it was an abuse of discretion for the trial court to use the evidence presented by the parties at the hearing when determining the value of the vehicles. Therefore, we overrule the second assignment of error.

### C. Third Assignment of Error

**{¶39}** In the third assignment of error, husband argues that the trial court erred in finding that he inequitably disposed of marital assets and awarding wife $63,122.76 as a result. Regarding this award, the magistrate made the following findings:

> Regarding issues involving marital liabilities, debts or

16

obligations, the parties did not address expenses on a prospective basis. [Wife] presented detailed financial records at [the] hearing of this matter demonstrating that [husband] had inequitably paid expenses and/or received monies that were not divided by the parties (i.e. these payments or pre-payments and receipt of monies such as rental income from the trailer located on the farm property had been withheld from [wife]) during the course of this litigation and after the issuance of the Administrative Restraining Order as regarding this matter. Additionally, [husband] had elected to forego [sic] payment on certain debts (such as the ongoing private school tuition of the minor child) that were borne solely by [wife]. This documentation demonstrated that the inequitable financial impact to [wife] amounted to $63,112.76 during the time period in question.

**{¶40}** The trial court overruled husband's objection on this issue, finding that the magistrate's award was based on the finding that husband inequitably paid expenses and received monies that were not divided by the parties and that such actions had a significant financial impact on wife. The magistrate's decision was then fully incorporated into the final divorce decree.

**{¶41}** Husband argues that this award was in error as the magistrate improperly treated his gross income as an asset and divided it between the parties. In doing so, the only legal authority he points to is R.C. 3119.01(C)(9)(a) and (b). R.C. 3119.01 is the definitional section for calculation of child support and does not contain a (C)(9)(a) or (b) provision. Rather, R.C. 3119.01(C)(9) contains only one definition for "federal poverty level." Presumably, husband meant R.C. 3119.01(C)(10)(a) and (b), which collectively provide the definition of "income." If husband did mean to

17

reference (C)(10), rather than (C)(9), this section simply provides that income, for a parent who is fully employed, means the gross income of the parent. *See* R.C. 3119.01(C)(10)(a). Husband does not point to any other legal authority in support of his argument.

**{¶42}** Wife argues that this award was proper where she provided "detailed financial records supporting $98,900.22 that she either paid with separate funds to cover certain marital expenses, including their child's school tuition and the parties' credit card debt, or that [husband] diverted away from their joint account."

**{¶43}** "The general rule in Ohio is that income earned by labor performed during the marriage is marital property whether received during the marriage or after the marriage." *Victor v. Kaplan*, 2020-Ohio-3116, ¶ 79 (8th Dist.), citing *Schweinfurth v. Meza*, 2002-Ohio-6316, ¶ 19 (8th Dist.), and R.C. 3105.171(A)(3)(a)(iii).

**{¶44}** At trial, the parties submitted lengthy, competing exhibits (extensive bank records) on this issue, with each party testifying in support of his or her own assertions. Wife's exhibits consisted of a self-made list that was color coded and listed funds that husband allegedly contributed and took away from their joint account during the period between February 2022 to December 2022 (between time of filing and the marriage termination date) and payments she allegedly made from her own separate funds during that period, and over 400 pages of bank records (from multiple relevant accounts) to support her assertions. Husband's evidence consisted of over 70 pages of bank records with certain highlights to assert who made certain transactions.

**{¶45}** When testifying about this evidence, wife said, "This is my reconciliation of what happened with the money when he moved everything out of where it had been historically in the joint account and he started a separate account. And, therefore, I

didn't have access to any of our income." She further indicated that she had to use her personal funds, from her half of the proceeds of a separate real property that the parties already sold, to cover certain joint debts or obligations. Ultimately, she asserted that husband owed her $63,112.76 as reconciliation. Husband testified and disputed certain assertions made by wife about the funds and debts/obligations at issue. Eventually, when asked if he was "agreeable" to the amount asserted by wife, the following interaction occurred:

Counsel:    Are you agreeable to that [amount]?

Husband:    I don't – no.

Counsel:    Tell us why.

Husband:    I mean, it seems to me, I have to be paying the bills.

Counsel:    Okay.

Husband:    And it seems to me, we pay the bills.

Counsel:    And so you believe that her request for her paying the bills and that you should reimburse her for the bills she paid –

Husband:    It doesn't seem (indiscernible).

**{¶46}** Ultimately, the magistrate apparently found wife's evidence to be more credible on this issue as the court awarded wife the amount that she requested as reconciliation. The entry expressly stated that the award was based on the "detailed financial records" provided by wife. Notably, husband does not directly challenge here on appeal the finding that he took improper financial actions.

**{¶47}** Instead, he seems to assert that the trial court considered income that was not marital property. However, he fails to point to or challenge any specific transaction from the financial records relied upon by the trial court when making this award. Rather, he simply makes generalized arguments about the income supposedly

19

deposited into the joint account during the litigation and the amount allegedly withdrawn by wife, on average, during that same period. He does not go into detail about any of the transactions or deposits at issue in the financial records that were relied upon by the trial court when making this award.

{¶48} "The appellant bears the burden of 'identify[ing] in the record the error on which [an] assignment of error is based.'" *Rummelhoff v. Rummelhoff*, 2020-Ohio-2928, ¶ 23 (1st Dist.), quoting App.R. 12(A)(2).

{¶49} By submitting only generalized arguments here on appeal with no citations to any specific transactions from the "extensive financial records" relied upon by the trial court or any relevant legal authority, husband has failed to meet his burden to demonstrate error in the trial court's award. *See generally In re J.G.S.*, 2019-Ohio-802, ¶ 31 (1st Dist.), citing *State v. Brown*, 2013-Ohio-2720, ¶ 24 (1st Dist.) ("'If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out.'"). Therefore, we overruled the third assignment of error.

### D. Fourth Assignment of Error

{¶50} In the final assignment of error, husband argues that the trial court erred in awarding wife a monetary value for her portion of the traveler points, rather than distributing them in kind. Regarding the traveler points, the magistrate made the following findings:

> Due to the nature of [husband]'s profession, this party is required to frequently travel to provide audiovisual services on a contracted basis. This frequent travel resulted in accumulation of significant amounts of award points as regarding this party. [Wife] requested that the parties equitably divide the cash value of the points, while [husband] requested that the existing point balances be divided

equally between the parties and that points be transferred into reward accounts to be established by [wife]. [Wife] countered, noting that a significant number of Delta points had been liquidated by [husband] during the pendency of this matter, with an estimated 2,470,655 points out of 2,763,485 being utilized by [husband] for personal trips. Notable among this point liquidation was the utilization of 1,710,000 miles to purchase tickets for [husband] and his children for a trip to Rome that was subsequently cancelled; the unused points were never returned to the master account and were asserted by [wife] to have been 'paid out' via voucher for future travel.

For purposes of reconciliation, the value of Hyatt points was demonstrated to amount to $13,337.49, the value of Marriott points was demonstrated to amount to $16,105.29, the value of the Hilton points was demonstrated to amount to $2,659.43, the value of IHG points was demonstrated to amount to $799.56, the value of Wyndam points was demonstrated to amount to $15.29, the value of the United Airlines points was demonstrated to amount to $6,146.02. Exclusive of Delta Airlines points, the cash value of the referenced traveler's points amounts to $39,493.45.

Regarding the Delta Airlines points, some 540,485 points remain in the account net of the allegedly personal trips taken by [husband] during the course of this action. While it is at least arguable that the trips to Boston, Florida, Denver and Las Vegas may have been somehow work-related, it is inarguable that the 1.7 million points associated with the cancelled trip to Rome were never credited back to

the account. For purposes of asset equalization, the Court determines that 2,250,485 Delta Airlines credits are subject to valuation and division (the remaining 540k points plus the 1.7 million points associated with the Rome trip); the total cash value of the referenced points is deemed to be $31,731.84. The total cash value of all traveler's points is deemed to amount to $71,225.28 ($39,493.45 non-Delta assets and $31,731.84 Delta assets).

{¶51} Accordingly, the magistrate attributed $35,612.65 (half of $71,225.28) to each party for purposes of property equalization and ultimately ordered, as part of the property equalization payment, that husband pay wife this estimated cash value for her half of the points. The trial court overruled husband's objection as to this issue, finding that wife was entitled to the cash value of her share of the points. The magistrate's decision was then fully incorporated into the final divorce decree.

{¶52} Husband argues that this award was in error as the trial court did not make any finding that distributing the traveler points in kind would be impractical or burdensome. In doing so, he points to R.C. 3105.171(E)(2), which states, "The court may make a distributive award in lieu of a division of marital property in order to achieve equity between the spouses, if the court determines that a division of the marital property in kind or in money would be impractical or burdensome."

{¶53} Wife argues the trial court did not make a distributive award as it was undisputed that the points were marital property, so the award did not come from separate property, as is necessary for a distributive award.

{¶54} A "distributive award" is defined as "any payment or payments, in real or personal property, that are payable in a lump sum or over time, in fixed amounts, *that are made from separate property or income, and that are not made from*

*marital property* and do not constitute payments of spousal support, as defined in section 3105.18 of the Revised Code." (Emphasis added.) R.C. 3105.171(A)(1).

**{¶55}** In *Schwark v. Schwark*, 2012-Ohio-3902 (3d Dist.), the court held that the trial court's order for husband to pay an equalization payment to wife in order to effectuate an equal division of marital assets was not a distributive award because the court was ordering "a division of the martial assets to equalize the division of marital property between the parties," so "there was no award of *separate* property." (Emphasis in original.) *Schwark* at ¶ 9-11, 33, 35.

**{¶56}** Similarly, in *O'Rourke v. O'Rourke*, 2010-Ohio-1243 (4th Dist.), the court held that the trial court did not make a distributive award by ordering husband to pay an equalization payment where the property at issue was marital because the payment was "an award to equalize the division of marital property," rather than an award from husband's separate property. *O'Rourke* at ¶ 19.

**{¶57}** Here, the trial court determined the total value of the parties' traveler points, which were considered to be marital property, and then awarded wife the cash value for her equity in these points for the purposes of calculating the ultimate property equalization payment to divide the marital property. In doing so, the trial court was not making a distributive award as there was no award from husband's separate property. Consequently, because the trial court was not making a distributive award, the trial court was not required to make a finding under R.C. 3105.171(E)(2) that distribution of the marital property in kind would be impractical or burdensome. Therefore, we overrule the fourth assignment of error.

### III.    *Wife's Motion for Expenses under App.R. 23*

**{¶58}** Post-briefing, wife filed a motion for attorney fees and costs under App.R. 23, asserting that husband's appeal was frivolous and stated no reasonable

grounds for review.

**{¶59}** App.R. 23 provides, "If a court of appeals shall determine that an appeal is frivolous, it may require the appellant to pay reasonable expenses of the appellee including attorney fees and costs." "An appeal is deemed frivolous under App.R. 23 when it does not present any reasonable question for review." *Burdge v. Supervalu Holdings, Inc.*, 2007-Ohio-1318, ¶ 22 (1st Dist.), citing *Riley v. Supervalu Holdings, Inc.*, 2005-Ohio-6996, ¶ 29 (1st Dist.). "The decision of whether to award attorney fees for frivolous conduct rests within the sound discretion of this court." *Rodriguez v. Catholic Charities Corp.*, 2022-Ohio-1317, ¶ 59 (8th Dist.), citing *Cominsky v. Malner*, 2004-Ohio-2202, ¶ 26 (11th Dist.).

**{¶60}** Wife argues that husband's appeal does not present a reasonable question for review as his arguments are not grounded in fact or law. In support of this argument, she points to *Hunter v. Rhino Shield*, 2024-Ohio-261 (10th Dist.). In *Hunter*, the Tenth District held that an appeal was not grounded in fact or law, and thus frivolous, where "[s]ettled legal questions that were the law of the case were treated as unresolved and subject to dispute." *Id.* at ¶ 47. Further, the party at issue in that appeal attempted to bring breach-of-contract claims against multiple parties who were not parties to the contract, one of which was not even in existence at the time the contact was formed, and the party failed to make any good-faith argument for extension, modification, or reversal of existing law, or establishment of new law. *Id.* Thus, the party was bringing claims/making an argument that was clearly not supported under existing law.

**{¶61}** Here, we do not have a situation where arguments were presented that were already addressed in previous appeals, nor any claims or arguments that were clearly not supported under existing law.

**{¶62}** Wife further asks this court to find that husband's appeal was frivolous because he failed to cite any legal authority for even the standard of review, let alone the issues raised.  In support of this request, she first points to *Cominsky v. Malner*, 2006-Ohio-6205 (11th Dist.).  However, a review of this case reveals that the court held the appeal to be frivolous where the appeal raised issues that the court had already addressed in previous appeals, as well as raised an issue with no citation to relevant legal authority.  *Id.* at ¶ 26-46.  Here, husband did not raise any issues that were already addressed in previous appeals.

**{¶63}** Wife further points to *Winkle v. Southdown, Inc.*, 1993 Ohio App. LEXIS 4295 (2d Dist. Sep. 3, 1993) in support of this argument.  However, the court in *Winkler* held that the appeal was frivolous where "all assignments of error [were] clearly without merit under settled principles of law."  *Id.* at *20.  The court did not hold that the appeal was frivolous for failing to point to relevant legal authority.

**{¶64}** It is true that husband failed to point to any relevant legal authority in bringing this appeal.  However, he included citations to the record, and this was ultimately a fact-intensive appeal.  And while his arguments could have been more well-developed and were ultimately not meritorious, it cannot be said that the appeal presented no reasonable question for review.  Therefore, this court finds wife's motion for expenses under App.R. 23 not well taken and denies the same.

## IV.   *Conclusion*

**{¶65}** For the foregoing reasons, we overrule husband's assignments of error and affirm the judgment of the trial court.  Further, we deny wife's motion for expenses under App.R. 23.  Costs will be awarded under App.R. 24 in the judgment entry accompanying this opinion.

Judgment affirmed.

**BOCK** and **MOORE, JJ.,** concur.