[Cite as *Mullins v. Mullins*, 2023-Ohio-3266.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| COREY L. MULLINS, | : | APPEAL NO. C-220389 |
| | | TRIAL NO. DR2001444 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| BRYAN D. MULLINS, | : | |
| | | |
| Defendant-Appellant. | : | |

Appeal From:   Hamilton County Court of Common Pleas, Domestic Relations
Division

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause
Remanded

Date of Judgment Entry on Appeal: September 15, 2023

*Martin E. Hubbell*, for Plaintiff-Appellee,

*J. Stephen Cox*, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1} Defendant-appellant Bryan Mullins appeals the decision of the Hamilton County Domestic Relations Court finding that a stock brokerage account he opened prior to his marriage was marital property and that plaintiff-appellee Corey Mullins was accordingly entitled to one-half of this account. In three assignments of error, Bryan argues that the trial court erred in characterizing the account as marital property, in treating the brokerage account as all cash, and in implying the brokerage account would need to be liquidated to divide the account.

{¶2} Following our review of the record, we hold that the trial court erred in finding that the entire brokage account was marital property. Because Bryan provided sufficient tracing evidence as to two blocks of stock in the brokerage account, we reverse the trial court's decision as to these two blocks of stock. But we affirm the trial court's decision as to the remaining blocks of stock, as Bryan failed to meet his burden to demonstrate that the assets were his separate property. We further hold that the trial court did not order liquidation of this brokerage account and therefore reject Bryan's argument in that regard. Accordingly, the judgment of the trial court is reversed in part and affirmed in part.

### *Factual and Procedural Background*

{¶3} Bryan and Corey were married on August 2, 2003. The parties separated on December 31, 2019, and Corey filed for divorce on September 21, 2020. They stipulated that the term of the marriage was from August 2, 2003, through December 31, 2019. The trial court held a bench trial to determine the division of property.

{¶4} Specifically at issue at trial was the division of an E*Trade brokerage account that Bryan opened prior to the parties' 2003 marriage. The account held numerous blocks of stock, as well as cash.

{¶5} At trial, Bryan presented evidence and testimony attempting to demonstrate that the E*Trade account contained shares of stock which were still his separate property. Specifically, he claimed the five specific blocks of stock shares within the account as separate property: Ameren Corporation, American Electric Power Company, Inc., Duke Energy Corporation, Proctor & Gamble Company ("P&G"), and Mastercard, Inc. Bryan testified as to the traceability of each of these shares of stock and submitted various financial statements in support of his testimony. He further testified that there was some passive growth in the stock holdings he was claiming as his separate property during the marital period. And he testified that he sold some shares of the Mastercard stock to pay off a home equity line of credit, which resulted in a tax liability in 2019.

{¶6} Bryan also hired an accounting firm, Flagel Huber Flagel ("FHF"), to perform a forensic accounting of the parties' accounts, investments, business assets, and property and to trace and identify their premarital and separate property. In its expert report, FHF concluded that the brokerage account was primarily Byran's separate property.

{¶7} But at trial, Randall Kuvin, Bryan's expert witness from FHF, testified that he did not review any financial statements from 2003 to 2013. And on cross-examination, Kuvin testified as to classification errors in the report and admitted that one incorrect entry in the report could have skewed the entire report.

{¶8} Corey did not have any expert witnesses testify on her behalf. She testified that she was aware that Bryan was making periodic deposits into the brokerage account. Bryan testified that he was depositing what constituted marital property into the brokerage account, but he withdrew roughly the same amount of cash that was deposited into the account.

{¶9} The magistrate held Bryan failed to meet his burden of proof to establish the brokerage account was his separate property. The magistrate reasoned that there were many errors in FHF's report, that Bryan failed to provide sufficient tracing evidence, and that the 2019 tax liability was incurred due to Bryan selling his separate interest in the Mastercard stock.

{¶10} Bryan filed objections to the magistrate's decision. The trial court overruled Bryan's objections as to the magistrate's findings regarding the brokerage account. The trial court subsequently entered a final judgment entry and decree of divorce.

{¶11} Bryan now appeals.

### *Classification of the Brokerage Account*

{¶12} In his first assignment of error, Bryan asserts the trial court erred in finding that the brokerage account was marital property, while also finding that the 2019 tax liability was Bryan's sole responsibility because it was incurred due to the sale of his separate interest in the Mastercard stock. And in his second assignment of error, Bryan asserts the trial court erred in treating the value of the brokerage account as all cash.

{¶13} "This court reviews the manner in which a domestic-relations court executes an equitable division of property for an abuse of discretion." (Internal

quotation marks omitted.) *Owens v. Owens*, 1st Dist. Hamilton No. C-210488, 2022-Ohio-3450, ¶ 14. "Factual issues, however, such as those arising in the classification and valuation of property, are reviewed under the distinct sufficiency-and-manifest-weight-of-the-evidence standards." *Id.* Additionally, "[b]ecause traceability presents a question of fact, we must give deference to the trial court's findings, and the court's decision on the matter will not be reversed as against the manifest weight of the evidence when it is supported by competent credible evidence." *Tyra v. Tyra*, 1st Dist. Hamilton No. C-210392, 2022-Ohio-2504, ¶ 15.

{¶14} "In divorce proceedings, the domestic relations court shall 'determine what constitutes marital property and what constitutes separate property.' " *Devito v. Devito*, 1st Dist. Hamilton No. C-210523, 2022-Ohio-2563, ¶ 22, quoting R.C. 3105.171(B). In *Devito*, we explained the differences between marital and separate property:

> The parties' marital property consists of real or personal property owned by either spouse, including retirement benefits acquired during the marriage and interest in those benefits. Marital property does not include any separate property. Separate property consists of, among other things, property acquired before the marriage and certain other property, such as inheritances and gifts, acquired by one spouse during the marriage. A spouse may retain separate property despite having commingled it with marital property, because as long as it is traceable, separate property retains its identity.

(Internal quotation marks and citations omitted.) *Id.* at ¶ 23. Martial property also "includes the appreciation on separate property due to the labor, monetary, or in-kind

contributions of either or both spouses that occur during the marriage." *Dunn v. Dunn*, 1st Dist. Hamilton Nos. C-010282 and C-010292, 2002-Ohio-6247, ¶ 24.

{**¶15**} And in *Tyra*, we explained the traceability of property:

Traceable here refers to evidence demonstrating a connection between property currently owned and some antecedent article of separate property. Such proof overcomes the effect of commingling, by which separate property may be transmuted into marital property. So in determining whether property is separate or marital, the key issue is traceability. The party in a divorce action claiming that specific property owned when the marriage terminates is not marital but separate property has the burden of proof by a preponderance-of-the-evidence standard. Generally, the evidence of tracing must be specific, and oral testimony unsupported by documentary evidence should not carry much weight.

(Internal quotation marks and citations omitted.) *Tyra* at ¶ 15.

{**¶16**} Evidence to support oral testimony of traceability can include clearly documented transactions. *See, e.g., Owens*, 1st Dist. Hamilton No. C-210488, 2022-Ohio-3450, at ¶ 27 (holding that husband sufficiently traced shares of stock he had purchased prior to marriage by submitting the sales history of the stock account); *Oliver v. Oliver*, 5th Dist. Tuscarawas No. 2012 AP 11 0067, 2013-Ohio-4389, ¶ 82 (noting that wife's testimony without supporting documents to trace funds in retirement account was insufficient to establish that it was her separate property); *Bergman v. Bergman*, 2d Dist. Montgomery No. 25378, 2013-Ohio-715, ¶ 33 (holding husband sufficiently traced his separate interest in the real property at issue by

6

submitting evidence of how he paid the purchase price and mortgage payments); *Reed v. Reed*, 3d Dist. Allen No. 1-09-63, 2010-Ohio-4550, ¶ 30-31 (concluding husband was entitled to investment accounts as separate property because he provided statements sufficient for tracing).

{¶17} At the outset, we note that Bryan does not contest the division of cash in the brokerage account. He concedes that the cash in the brokerage account has been extensively commingled and there was no way to adequately trace it. Rather, his claims of separate property are limited to the shares of Ameren, American Electric Power, Duke Energy, P&G, and Mastercard stock in the brokerage account.

{¶18} Bryan further asserts that he is no longer relying on FHF's report to support his arguments. Bryan does, however, argue that the trial court's focus on FHF's report was misplaced, and we agree. In focusing on the issues in FHF's report, the trial court ignored the numerous E*Trade statements and consolidated 1099 tax statements that Bryan also submitted as exhibits at trial.

{¶19} Thus, the only relevant inquiry here is the traceability of each of the blocks of stock that Bryan claims as his separate property. We consider each of these in turn below.

### A. Traceability of the Ameren Stock

{¶20} At the end of the marital term, there were 122 shares of Ameren stock in the brokerage account. Bryan contends he is entitled to these shares as his separate property.

{¶21} Bryan testified at trial that he acquired shares of Ameren stock in 1998 through a dividend reinvestment plan. He further testified that under this plan, when dividends were paid out on this stock, the dividends were automatically used to

purchase more shares of stock. According to a summary statement of Bryan's dividend reinvestment account with Ameren, which was submitted as an exhibit at trial, Bryan had 32.6421 shares of Ameren stock in January 1998. The summary statement further showed that in October 2017, Bryan accumulated 122.6143 shares, transferred 122 of these shares to his brokerage account, and sold the remaining 0.6143 shares. Bryan also submitted an October 2017 E*Trade statement as an exhibit at trial. This statement confirmed the transfer of 122 shares of Ameren stock to his brokerage account.

{¶22} Bryan's testimony and these detailed statements establish that Bryan's ownership of these shares predated the marital term and that the increase in the number of shares was merely the expected result of the dividend reinvestment plan Bryan had enrolled in with Ameren. The appreciation of these shares was not due to Bryan's labor, money, or in-kind contribution. *See Dunn*, 1st Dist. Hamilton Nos. C-010282 and C-010292 2002-Ohio-6247, at ¶ 24. Because Bryan sufficiently traced the 122 shares of Ameren stock as his separate property, the trial court's classification of these shares as marital property was against the manifest weight of the evidence and is accordingly reversed.

### *B. Traceability of the American Electric Power Stock*

{¶23} Bryan also asserts he is entitled to the 55 shares of American Electric Power that were in the brokerage account at the end of the marital term as his separate property.

{¶24} At trial, Bryan testified that he purchased 55 shares of American Electric Power stock in 1999, and a June 2020 portfolio summary of the brokerage account from E*Trade, which he submitted as an exhibit, confirmed this purchase. He also

submitted an August 2003 E*Trade statement as an exhibit, and this showed that he entered the marriage with these 55 shares of American Electric Power in the brokerage account.

{¶25} The June 2020 portfolio summary from E*Trade further demonstrated that Bryan owned 100 shares of American Electric Power at that time, because he purchased 45 additional shares in April 2015. But he does not claim these shares as separate property. And the October 2017 and December 2019 E*Trade statements, which he also submitted as exhibits, established that he never had more than 100 shares of American Electric Power in the brokerage account.

{¶26} Because the E*Trade statements and portfolio summary confirm Bryan's testimony that he had a block of 55 shares of American Electric Power Stock before and after the marital term, he sufficiently traced these shares. The trial court's classification of these shares as marital property was also against the manifest weight of the evidence and is therefore reversed.

### C. Traceability of the Duke Energy Stock

{¶27} Next, Bryan contends he is entitled to the 52 shares of Duke Energy that were in the brokerage account at the end of the marital term as his separate property.

{¶28} Bryan testified at trial that he purchased 52 shares of Duke Energy prior to marriage, but he could not testify as to the date of the purchase. The June 2020 E*Trade portfolio summary showed a block of 52 shares of Duke Energy, but unlike the other blocks of stock, there was no purchase date provided. Bryan testified that this was because he originally purchased these 52 shares from Cincinnati Gas & Electric, which became Cinergy Corporation ("Cinergy") and was later purchased by

Duke Energy in 2006. But the August 2003 E*Trade statement showed that Bryan entered the marriage with 100 shares of Cinergy stock.

{¶29} Now, on appeal, Bryan asserts he entered the marriage with 100 shares of Cinergy stock. He further explains that when Cinergy was acquired by Duke Energy in 2006, he received 1.56 shares of Duke Energy in exchange for each share of Cinergy stock he owned and therefore held 156 shares of Duke Energy stock at that time. He also asserts that because of a reverse three-for-one stock split in 2012, his holdings were reduced to 52 shares. He argues this is all a matter of public record.

{¶30} Before the trial court, however, Bryan never argued that Duke Energy's acquisition of Cinergy, the resulting stock exchange, and subsequent stock split were matters of public record. Rather, Bryan now contends we may now take judicial notice of these events, despite his failure to request the same of the trial court.

{¶31} But "[t]he party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property." *Reed*, 3d Dist. Allen No. 1-09-63, 2010-Ohio-4550, at ¶ 10. For example, in *Idone v. Idone*, the court held that because there was no corroborating evidence as to the alleged stock splits husband described other than his self-serving testimony, he failed to prove by a preponderance of the evidence that the shares of stock at issue were his separate property. *Idone v. Idone*, 11th Dist. Portage No. 2004-P-0052, 2005-Ohio-2522, ¶ 21-22. Here, not only did Bryan fail to provide any corroborating evidence to explain the changes in the number of shares of Duke Energy stock he owned, but he also never testified as to a stock exchange and stock split at trial. Because Bryan failed to meet his burden in tracing these shares, the trial court's classification of these shares is affirmed.

### D. Traceability of the P&G Stock

**{¶32}** At the end of the marital term, there were also 100 shares of P&G stock in the brokerage account, which Bryan claims are his separate property.

**{¶33}** Bryan testified at trial that he purchased 100 shares of P&G stock in March 2000, which is confirmed by the June 2020 E*Trade portfolio summary. But, as Corey correctly notes, there were only 50 shares of P&G stock in the August 2003 E*Trade statement. In an attempt to explain this discrepancy, Bryan asserts there was a two-for-one stock split in June 2004, which doubled the number of shares and halved the price of shares for all P&G stockholders. Consequently, Bryan asserts his position was left unchanged, despite an apparent increase in the number of shares he owned.

**{¶34}** But again, Bryan never requested that the trial court take judicial notice of this stock split, and he therefore failed to meet his burden in tracing these shares. Accordingly, the trial court's classification of these shares is affirmed.

### E. Traceability of the Mastercard Stock

**{¶35}** Lastly, Bryan asserts that the 505 shares of Mastercard stock that were in the brokerage account at the end of the marital term are his separate property.

**{¶36}** At trial, Bryan testified that he bought two blocks of Mastercard stock in 2006 and 2007 using the proceeds of sales of stock that he owned prior to marriage. According to the August 2003 E*Trade statement, Bryan entered the marriage with 120 shares of Sun Microsystems, Inc., stock, 50 shares of Oracle Corporation stock, 96 shares of Cisco Systems, Inc., stock, and 50 shares of Pfizer, Inc.

**{¶37}** Consolidated tax statements submitted as exhibits at trial showed that Bryan sold his shares of Sun Microsystems in 2004 and Oracle stock in 2005. And on

May 25, 2006, Bryan sold his shares of Cisco Systems stock and purchased 45 shares of Mastercard stock. The sale of the Sun Microsystems, Oracle, and Cisco Systems stock yielded $3,180.89 in profit for Bryan, and he purchased the 45 shares of Mastercard stock for $2,009.79. Then, on August 2, 2007, Bryan sold his shares of Pfizer stock for $1,174.49 and purchased an additional 13 shares of Mastercard stock for $1,887.58.

{¶38} The timing and proceeds of these sales tended to corroborate Bryan's position that he purchased the Mastercard stock by selling shares of stock he owned prior to marriage, although there were questions as to whether Bryan's holdings in Mastercard were too commingled with other funds to be traceable. But at trial, Bryan attempted to resolve these questions by testifying that, due to a ten-for-one stock split in 2014, he should have had 580 shares of Mastercard stock. He further testified that in 2019, he sold 75 shares of Mastercard stock to pay off a home equity line of credit. He testified that there were 505 shares of Mastercard stock left in the brokerage account at the end of the marriage.

{¶39} Though Bryan testified as to the stock split at trial, he did not request that the trial court take judicial notice of this fact. Like the court held in *Idone*, Bryan cannot rely on his self-serving testimony alone. *See Idone*, 11th Dist. Portage No. 2004-P-0052, 2005-Ohio-2522, at ¶ 21-22. Because corroborating evidence as to this stock split was required, Bryan should have requested that the trial court take judicial notice of this fact. Evid.R. 201(D) provides that, "A court shall take judicial notice if requested by a party and supplied with the necessary information." Given Bryan did not make such a request, he failed to meet his burden in tracing the shares of

Mastercard stock as his separate property. Thus, the trial court's classification of these shares as marital property is affirmed.

**{¶40}** Bryan also asserted that the trial court contradicted itself in holding him solely responsible for the tax liability incurred in 2019 due to the sale of 75 Mastercard shares. We agree. Because the Mastercard stock was classified as martial property by the trial court, the responsibility for the tax liability should have been shared between Bryan and Corey.[1] The trial court's error, however, does not prove that the Mastercard stock was separate property as Bryan argues. It merely demonstrates that the trial court incorrectly allocated tax liability to Bryan, a point Bryan does not raise in this appeal other than to cite it as evidence of the character of the Mastercard stock.

**{¶41}** Accordingly, Bryan's first assignment of error is overruled. While we agree that the trial court should not have required Bryan to solely pay the taxes associated with the 2019 Mastercard stock sale, as the Mastercard stock belonged to the parties jointly, Bryan has not appealed that issue. The trial court's characterization of the Mastercard stock for tax purposes does not alleviate Bryan's burden to demonstrate that it was his separate property, a burden he did not meet at trial.

**{¶42}** However, Bryan's second assignment of error is sustained as to the shares of Ameren and American Electrical Power stock, because Bryan did sufficiently trace these shares as his separate property. And because he did not meet his burden as to the Duke Energy, P&G, and Mastercard stock, his second assignment of error is overruled as to these shares. Therefore, the trial court's judgment is reversed in part and affirmed in part.

---

[1] On appeal, neither party challenged the trial court's allocation of the tax liability for the 2019 Mastercard stock sale solely to Bryan. Rather, Bryan only argues that because the trial court assessed the tax liability solely to him, the Mastercard stock must be his separate property. Therefore, the error is not before us, and we cannot provide relief to Bryan for the trial court's mistake in requiring him to individually pay the 2019 tax.

### *Liquidation of the Brokerage Account*

**{¶43}** In his third assignment of error, Bryan contends that the trial court erroneously treated the brokerage account as a cash asset and implied that the stock holdings would need to be liquidated to be divided.

**{¶44}** But the trial court never mandated a liquidation of the brokerage account. Rather the trial court held that, "[Corey] shall be entitled to one-half of this [brokerage] account as of 12/31/2019, plus or minus any gains or losses through the date of distribution." We do not interpret this language to mean that the trial court suggested that the only means of dividing the brokerage account was through liquidation. The trial court only held that Corey was entitled to one-half of the brokerage account. As discussed above, we agree with this holding as applied to the shares of Duke Energy, P&G, and Mastercard stock, but not as to the shares of Ameren and American Electric Power stock. The third assignment of error is accordingly overruled.

### *Conclusion*

**{¶45}** For the reasons set forth in this opinion, the trial court's judgment is reversed in part and affirmed in part. This cause is remanded for proceedings consistent with the law and this opinion.

Judgment affirmed in part, reversed in part, and cause remanded.

**BERGERON, P.J.,** and **BOCK, J.,** concur.

Please note:
The court has recorded its own entry on the date of the release of this opinion.