# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

CHRISTINA SHTEIWI,

      Plaintiff-Appellee,

  vs.

WILLIAM ABDELMASSIH,

      Defendant-Appellant.

:
:
:
:
:
:
:

APPEAL NO. C-240429
TRIAL NO. DR-2201712

*JUDGMENT ENTRY*

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 8/15/2025 per order of the court.**

**By:**_____
     **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| CHRISTINA SHTEIWI, | : | APPEAL NO. | C-240429 |
| | | TRIAL NO. | DR-2201712 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| WILLIAM ABDELMASSIH, | : | *O P I N I O N* | |
| Defendant-Appellant. | : | | |

Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 15, 2025

*Katz, Teller, Brant & Hild* and *Wijdan Jreisat*, for Plaintiff-Appellee,

*DeBra Law, LLC*, and *Ryan L. DeBra*, for Defendant-Appellant.

**MOORE, Judge.**

**{¶1}** Defendant-appellant William Abdelmassih ("Husband") and plaintiff-appellee Christina Shteiwi ("Wife") countersued one another in a divorce action before the Hamilton County Court of Common Pleas, Domestic Relations Division. Now, Husband appeals the lower court's judgment, raising six assignments of error. These arguments concern the court's classification of rental properties as marital assets, the court's division of certain marital assets including cryptocurrencies, as well as the court's child support order. For the reasons set forth below, we affirm the judgment of the trial court.

## I. Factual and Procedural History

**{¶2}** In October 2022, Wife and Husband countersued one another for divorce. Within their respective complaints, the parties identified that they were married in January 2016 and had one minor child, G.M., born in January 2020. Both complaints alleged that the parties were incompatible.

**{¶3}** On March 26, 2024, the parties entered into a parental visitation agreement. The parties agreed that Wife would be the sole and residential custodian of G.M., and that Husband would have visitation with G.M. for two days a month, in addition to two weeks of extended visitation per year.

**{¶4}** In April 2024, the parties' trial commenced and focused upon the division of marital assets. Wife testified on her own behalf and called Husband and Sam Al Seman, one of Husband's business partners, to testify. Similarly, Husband testified on his own behalf and called Wife and Randall Kuvin, CPA-ABV, CFF, a forensic accountant, to testify.

**{¶5}** In his testimony, Husband explained that the parties met in 2013. At the time, Husband was living in California, while Wife was living in Ohio. Prior to the

marriage, Husband owned and managed multiple rental properties in California. Husband testified that in November 2016, he and a co-investor sold four co-owned California based rental properties. Husband recalled that in February 2017, he and the co-investor used $254,813.53 from the November sale to purchase the Harness Street property ("Harness") through an Internal Revenue Code § 1031 like-kind exchange. Husband explained that Harness was a multi-unit apartment complex, also located in California.

{¶6} In 2017, the parties moved to California. While Wife transferred jobs, Husband was primarily unemployed and solely focused upon refurbishing Harness. Husband recalled that he and his co-investor only completed minor improvements to the property, and that major projects, such as the land excavation and flooring installation, were completed by contractors. While Husband asserted that Wife's only contribution was occasionally running errands and bringing food to the property, Wife argued otherwise. Wife insisted that, in addition to supporting the family by maintaining full-time employment, she aided in the completion of outdoor work, painting, cleaning, and operational management of the property.

{¶7} At some point in 2017, Wife signed an interspousal deed, which recognized that Harness would be Husband's separate property. While Husband asserted that both parties were aware of the effect of the document, Wife testified that she was not. Instead, Wife believed that the document was necessary for the couple to be eligible for optimal tax benefits.

{¶8} Husband testified that in November 2018, Husband sold Harness, and was paid $399,732.77 for his share, and reported a $227,000 profit on the parties' joint tax return.

{¶9} In 2018, the parties moved back to Cincinnati. Husband testified that,

after returning to Cincinnati, he used the funds from the Harness sale to continue acquiring investment properties in both Ohio and Kentucky. In 2019, Husband purchased the Creek Knoll property as well as two properties at Phelps Court.

**{¶10}** Husband sold the Creek Knoll property in May 2020, and, in October 2020, he purchased the Capitol Avenue property.

**{¶11}** In 2021, Husband and Sam Al Seman, a family friend and business partner, co-purchased the Rufus Street property. Wife also insisted that in 2021 Husband and Al Seman, through Al Seman's LLC, co-purchased two properties on Lafayette Avenue. Wife put forth no evidence in support of this assertion, and both Husband and Al Seman refuted this claim. In addition to real estate investments, the parties testified about their investment accounts, stock portfolios, and cryptocurrency wallets.

**{¶12}** Around 2019 the parties purchased the Van Gordon property, their first marital home. At some point in 2021, the parties sold the Van Gordon property and purchased the Auberger property. Both parties were named on the Auberger deed, while only Wife was listed on the mortgage.

**{¶13}** In 2022, the parties separated, and Husband moved out of the Auberger property. Soon thereafter, Wife also moved out and began renting what had been the marital home. Wife alleged that while moving out, she kept personal effects in the home's basement and, at some point, Husband entered the home and took a miscellaneous collection of Wife's personal effects. These items included jewelry Wife had received as gifts as well as familial memorabilia. Husband refuted this claim.

**{¶14}** Husband's forensic accountant, Randall Kuvin, attempted to trace the parties' finances. Kuvin testified that Husband owned $343,792 in separate property, the parties' marital property was worth approximately $87,466, and Wife had $23,698

in separate property. Kuvin's analysis commenced with the purchase of Harness and he opined that all sale proceeds from Harness constituted Husband's separate property. Therefore, Kuvin believed that the subsequent real estate properties were Husband's separate property because they were derived from the separate Harness proceeds.

{¶15} Kuvin's testimony and report traced cash flow from Harness, noting how the funds were used in the subsequent purchase of rental properties in addition to the Van Gordon property.

{¶16} However, Kuvin's asset tracing relied on a number of assumptions. Kuvin assumed that Harness's mortgage was not paid with marital funds, and that no marital efforts contributed to Harness's appreciation in value. Kuvin conceded that his report was premised upon the assumption that Harness was entirely separate, and that if he were to be incorrect, all subsequent property classifications could be affected.

{¶17} On June 6, 2024, the trial court issued its decision. The court found that Husband had not effectively demonstrated that the Harness property was his separate property. Specifically, the court considered Wife's steady employment to be "necessary to provide both funding and to assist in obtaining financing for" the properties. Further, the court found that the interspousal deed Wife signed had no binding effect, because at the time of the deed, Ohio law rendered post-nuptial agreements invalid.

{¶18} The court further detailed deficiencies in Kuvin's testimony. The court found fault in Kuvin's assumptions that Harness was completely separate, without considering whether marital efforts or funds contributed to the property's appreciation, or whether marital funds were used to pay for Harness's mortgage. The court also found that Kuvin improperly assumed that the funds for real estate purchases were separate, given that they were commingled and came from the parties'

6

joint accounts. In finding that Husband failed to trace separate property, the court found that all non-stipulated property should be classified as marital.

**{¶19}** The court next attempted to divide the parties' assets. The court awarded Wife the Auberger property, while Husband was awarded Rufus, as well as all properties owned under Husband's business, Massih Rentals, LLC, which included the Phelps and Capitol rental properties. As to cryptocurrencies, the court ordered that the parties' wallets be divided equally based on the number of coins versus the account value at the time the parties separated. The court also ruled that the parties retain their respective cars, that Husband was to return any of Wife's belongings he had taken, and that the parties were to attempt to split the items. Based upon the allocation of assets, the court ordered Husband to make an equalization payment of $166,368.47 to Wife.

**{¶20}** As to the issue of support for G.M., the court adopted a child support obligation that exceeded the scheduled obligation. The court considered that the parties' 2022 joint tax return indicated that Wife earned $54,166, while Husband made $50,180 as an assistant manager, plus $43,899 in rental income, for a total of $94,079 in earnings. While the standard support obligation would have obligated Husband to pay $787.91 per month, the court deviated and adopted a child support order of $2014.47 per month.

**{¶21}** The court asserted that the upward deviation was appropriate pursuant to R.C. 3110.23(C), (I), (P), and (Q) because it was to compensate Wife for costs she incurred in raising G.M. Specifically, the deviation was to assist Wife in paying $5,356 for G.M.'s tuition, $20,540 for afterschool and summer care, and $3,049 for extracurricular lessons that G.M. had been enrolled in while the parties were together.

**{¶22}** The court determined it was necessary to include these costs in the child support order because the parties' relationship was contentious and

noncommunicative.

**{¶23}** Additionally, the court ordered Husband to maintain a $500,000 life insurance policy until G.M. reached the age of 18, with Wife listed as the sole beneficiary.

**{¶24}** Husband timely appealed.

## II.    Analysis

**{¶25}** Husband raises six assignments of error on appeal. The assignments address the court's characterization of proceeds from the sale of Harness, the court's classification of the Phelps properties as marital assets, the court's calculation of Husband's child support obligation, and the court's instruction mandating that Husband maintain a $500,000 life insurance policy. Husband also takes issue with the court's directive that he return certain articles of Wife's personal property, as well as the court's division of the parties' cryptocurrency by coin rather than by the currency's stated value. We consider these arguments in turn.

### A.  Marital Classification of the Harness Proceeds

**{¶26}** We review a trial court's equitable division of property for an abuse of discretion. *Edje v. Holmes*, 2024-Ohio-1663, ¶ 15 (1st Dist.). However, when the characterization or valuation of property is in question, we review for either the sufficiency or manifest weight of the evidence, depending on the challenge levied by the party taking issue with the classification. *Id.*, citing *Carter v. Carter*, 2024-Ohio-1046, ¶ 19 (1st Dist.).

**{¶27}** We addressed the difference between separate and marital property in *Mullins v. Mullins*, 2023-Ohio-3266 (1st Dist.):

The parties' marital property consists of real or personal property owned by either spouse, including retirement benefits acquired during

the marriage and interest in those benefits. Marital property does not include any separate property. Separate property consists of, among other things, *property acquired before the marriage* and certain other property, such as inheritances and gifts, acquired by one spouse during the marriage. A spouse may retain separate property despite having commingled it with marital property, because as long as it is traceable, separate property retains its identity.

(Emphasis added.) *Id*. at ¶ 14, quoting *Devito v. Devito*, 2022-Ohio-2563, ¶ 23 (1st Dist.).

**{¶28}** How property appreciates is also material to its equitable division. Marital property includes "active appreciation," or "appreciation on separate property, due to the labor, monetary, or in-kind contributions of either or both of the spouses that occurred during the marriage." *Sherman v. Sherman*, 2013-Ohio-3501, ¶ 17 (1st Dist.), citing R.C. 3105.171(A)(3)(a)(iii). In contrast, "passive appreciation," or appreciation that is attributable to a property's location or market inflation and not to efforts expended by a marital party, remains separate property. *See id.*, citing R.C. 3105.171(A)(6)(a)(iii); *see also Tochtenhagen v. Tochtenhagen*, 2010-Ohio-4557, ¶ 45 (11th Dist.) (explaining the difference between active and passive appreciation).

**{¶29}** The "key issue" in determining whether property is separate or marital boils down to the traceability of the commingled asset. *Tyra v. Tyra*, 2022-Ohio-2504, ¶ 15 (1st Dist.). The party disputing the marital classification of property bears the burden of demonstrating by a preponderance of the evidence that the asset in question is separate property. *Id.* Therefore, at trial, Husband bore the burden to demonstrate that the proceeds from the Harness sale constituted separate property.

**{¶30}** Husband asserts that Harness remained separate property from

purchase to sale. Husband maintains that the initial funds used to purchase the property were his separate property, as the funds originated from a sale that predated the marriage. He also emphasizes that Wife signed an interspousal deed in 2017, which divested her of any interest in the property. Further, Husband suggests that any appreciation in the value of Harness was not the result of marital efforts. Despite these contentions, Husband's argument fails.

**{¶31}** First, the classification of the funds used to purchase Harness is not dispositive of the question of how the proceeds should be classified. Wife conceded that a large portion of the funds used to purchase the property were derived from Husband's like kind exchange of his separate property. However, Husband failed to refute Wife's assertion that martial funds financed the property's mortgage.

**{¶32}** Husband also failed to demonstrate that Harness's appreciation was not a result of marital effort. While Husband testified that neither he nor Wife expended serious efforts in refurbishing Harness during the marriage, Wife's testimony directly refuted this assertion. Wife testified that she assisted Husband in both the labor and the managerial operations in ensuring that the property was improved. As this boiled down to a credibility determination, the trial court was in the best position to assess the credibility of the witnesses and found Wife's testimony explaining the appreciation of Harness to be more credible. *See Stewart v. Stewart*, 2025-Ohio-1635, ¶ 22 (1st Dist.) ("it was within the purview of the trial court to determine credibility when resolving evidentiary conflicts").

**{¶33}** Further, the interspousal deed was void as a matter of law. In 2017, R.C. 3103.06 prohibited the enforcement of any post-nuptial agreement classifying marital property as separate. *See Gomer v. Gomer*, 2017-Ohio-989, ¶ 41-42 (6th Dist.). R.C. 1.48 states that "[a] statute is presumed to be prospective in its operation unless

expressly made retrospective." While R.C. 3103.06 was amended in 2023 to permit post-nuptial agreements, the amended version does not contain any language that contemplates retrospective application. *See Williamson v. Williamson*, 2024-Ohio-1919, ¶ 43 (12th Dist.) (holding R.C. 3103.06 could not be retroactively applied). Therefore, the court did not err when it did not consider the interspousal deed.

**{¶34}** Husband's final argument in support of his first assignment of error hinges upon a particular phrase included in the trial court's findings. In its final entry, the court stated,

> Testimony presented during the trial clearly demonstrates that the Husband's marital efforts, through his labor, actively increased the value of the Harness Street property by $400,000. Furthermore, the Court finds that the Wife's dedication to working *and parenting the parties' child* represents a partnership that she and Husband, together, were both responsible for enhancing the Harness Street value while at the same time meeting the needs of their family.

(Emphasis added.) Husband asserts that the italicized language constitutes a reversible error, given that Harness was sold more than a year before G.M. was born. We disagree. While it is certainly erroneous, the court considered and found Wife's testimony that both partners contributed to the active appreciation of the property to be credible. In consideration of the complete record, we cannot say that the trial court's misstatement yielded an abuse of discretion.

**{¶35}** In sum, Husband has failed to put forth sufficient evidence to refute the trial court's classification of the proceeds from the Harness sale as marital. The court considered competent and credible evidence that the parties' marital efforts contributed to the active appreciation of the property. Specifically, the court noted that

Wife's continued employment was "necessary to provide both funding and to assist in obtaining financing for" the properties. Therefore, we cannot say that the court abused its discretion when it found the proceeds from the Harness sale were marital.

**{¶36}** Accordingly, Husband's first assignment of error is overruled.

### *B. Tracing*

**{¶37}** In his second assignment of error, Husband argues the court erred when it found he failed to put forth sufficient evidence tracing the proceeds of Harness to the purchase of subsequent real estate properties.

**{¶38}** The party contending that a particular property is separate must demonstrate by a preponderance of the evidence that the asset is separate property and can be traced. *Mullins*, 2023-Ohio-3266, at ¶ 31 (1st Dist.), citing *Reed v. Reed*, 2010-Ohio-4550, ¶ 10 (3d Dist.). "Because traceability presents a question of fact, we must give deference to the trial court's findings, and the court's decision on the matter will not be reversed as against the manifest weight of the evidence when it is supported by competent credible evidence." *Tyra*, 2022-Ohio-2504, at ¶ 15 (1st Dist.), quoting *Fiamengo v. Fiamengo*, 2016-Ohio-4720, ¶ 29 (2d Dist.), quoting *Maloney v. Maloney*, 2005-Ohio-1368, ¶ 23 (2d Dist.).

**{¶39}** Husband attempted to satisfy his tracing burden by relying upon Kuvin's testimony and report. While he insists that there were no errors within Kuvin's report, Husband disregards the court's conclusion that the report was entirely reliant on assumptions. The court found that

> Mr. Kuvin admitted that he did not analyze contributions to the assets during the marriage, such as mortgage payments or the efforts and skills of either party, nor did he account for any active appreciation of the asset during the marriage. This oversight includes his evaluation of the

12

Harness Street property, which Mr. Kuvin testified is where the "story" starts and he categorized as entirely as separate property. The Court does not accept this characterization as factual.

**{¶40}** Based on the court's finding that Husband failed to prove that Harness was separate property, Husband had the obligation to demonstrate that the funds to purchase subsequent properties could be traced to separate, non-marital funds. The evidence before this court indicates that Husband failed to do so. There is competent credible evidence to support the court's decision, and we cannot say that the court's conclusion is against the manifest weight of the evidence.

**{¶41}** Accordingly, Husband's second assignment of error is overruled.

### C.  Child Support

**{¶42}** In his third assignment of error, Husband posits that the trial court miscalculated his child support obligation, failed to accurately consider the relevant R.C. 3119.23 factors, and relied on a justification for the upward deviation that was inflated and inaccurate.

**{¶43}** We review a trial court's child support determination for an abuse of discretion. *Rummelhoff v. Rummelhoff*, 2022-Ohio-1224, ¶ 18 (1st Dist.). Courts utilize the child support schedule as a formulaic tool to calculate the guideline support amount based upon the income of the parties. *Id.* at ¶ 19; *see* R.C. 3119.02. However, if the court determines that the guideline amount would be "unjust or inappropriate and therefore not be in the best interest of the child" in light of the factors in R.C. 3119.23, the court may deviate from the guideline amount. *Brew v. Brew*, 2023-Ohio-1457, ¶ 32 (1st Dist.). A court's deviation must be supported by findings of fact and journalized. *Rummelhoff* at ¶ 19.

**{¶44}** The relevant R.C. 3119.23 factors are:

(C) Extended parenting time or extraordinary costs associated with parenting time, including extraordinary travel expenses when exchanging the child or children for parenting time;

. . .

(I) Significant in-kind contributions from a parent including, but not limited to, direct payment for lessons, sports equipment, schooling, or clothing;

. . .

(P) Extraordinary childcare costs required for the child or children that exceed the maximum state-wide average cost estimate as described in division (P)(1)(d) of section 3119.05 of the Revised Code, including extraordinary costs associated with caring for a child or children with specialized physical, psychological, or educational needs;

(Q) Any other relevant factor.

R.C. 3119.23. Should the court grant a deviation based on division (Q), it must enumerate the facts warranting the deviation. *Id.*

**{¶45}** In Husband's third assignment of error, he claims he was confused as to how the court determined that his taxable income was $94,079. But the trial court noted that, based upon his 2022 tax return, Husband made $50,180 as an assistant manager and $43,899 from his adjusted rental income minus expenses (excluding depreciation expenses). R.C. 3119.01(C)(16)(b) provides that when assessing a parent's gross income, the court deducts ordinary and necessary expenses but excludes depreciation expenses that are allowed as deductions on a federal tax return. Here the court appropriately considered R.C. 3119.01(C)(16)(b) and appropriately excluded Husband's depreciation expenses. The resultant total income of $94,079 is properly

reflected in these calculations.

**{¶46}** Husband challenges the court's upward deviation from the basic child support schedule by alleging it was punitive. However, the court below determined that the guideline amount would not adequately support G.M. and determined that the deviation was appropriate based on the factors enumerated in R.C. 3119.23(C),(I), (P), and (Q).

**{¶47}** Here, R.C. 3119.23(I) applied because G.M. was enrolled in private school. Other courts have recognized that private school tuition may serve as a form of child support if (1) it is in the best interest of the child; (2) the paying party can afford the tuition; (3) the child has been in private school; and (4) private schooling would have continued if not for the ending of the marriage. *Kulis v. Kulis*, 2022-Ohio-3114, ¶ 29 (11th Dist.), citing *Kaminski v. Kaminski*, 1997 Ohio App. LEXIS 722, *3 (12th Dist. Mar. 3, 1997); *see Elliot-Thomas v. Lewis*, 2019-Ohio-3870, ¶ 21 (9th Dist.); *Ungerleider v. Ungerleider*, 2011-Ohio-2600, ¶ 26 (12th Dist.). Here, the trial court found that the parties had a pretrial agreement that G.M. should continue attending the same private school, that the cost of tuition had decreased from what the parties had originally agreed to pay, and that G.M. would benefit from continuity.

**{¶48}** Similarly, the court correctly determined that R.C. 3119.23(C) and (P) also applied. The court considered that Wife faced extraordinary care expenses arising from her extended parenting time of G.M. The parties' parenting time and income were not comparable, as Husband only had visitation with G.M. two days a month and earned nearly $40,000 more than Wife. The court found Wife's testimony credible as to anticipated costs arising from afterschool and summer care, given G.M.'s age, and that Wife was G.M.'s sole caregiver. While Husband alleges this conclusion was erroneous, he fails to cite to relevant case law. Instead, Husband cites to *Williams v.*

*Williams*, 2016-Ohio-3344, ¶ 15 (10th Dist.), a case concerning a downward deviation where parents shared equal parenting time. However, the visitation schedule here fell far short of equal parenting time as Husband only had G.M. two days per month. Based upon the facts before the trial court and the journalized findings in the court's entry, we cannot say that the court's upward deviation constituted an abuse of discretion.

**{¶49}** Upon a review of the court's entry, we observe that the court made no express findings as to why R.C. 3119.23(Q), the catchall factor, applied. While Husband did not raise this issue, R.C. 3119.23 states that if a court considers the (Q) factor, it must specifically articulate the facts that are the basis for the deviation. While the court preformed a deep analysis and expressly identified why R.C. 3119.23 (C), (I), and (P) applied, the court failed to make any reference to how (Q) applied. At most, this omission amounts to harmless error in view of the court's in-depth findings on the other relevant factors in making its deviation decision.

**{¶50}** Accordingly, Husband's third assignment of error is overruled.

### D. Life Insurance

**{¶51}** In his fourth assignment of error, Husband insists that the court erred when it required Husband to maintain a $500,000 life insurance policy.

**{¶52}** Ohio courts have held that

[i]t is common practice for a court to impose an obligation on a parent

to maintain life insurance for the benefit of minor children until they

reach majority following a divorce in order to protect the children's need

for support should the parent die before the children reach majority.

*Zaccardelli v. Zaccardelli*, 2013-Ohio-1878, ¶ 43 (9th Dist.), quoting *Denney v. Denney*, 1985 Ohio App. LEXIS 5678, * 2 (2d Dist. Jan. 25, 1985).

**{¶53}** Contrary to this principle, Husband argues that proceeds from the

ordered policy would entitle G.M. to more support than the child would be provided if Husband remained alive until G.M. reached the age of majority.

**{¶54}** Husband's sole support for this position lies in *Grover v. Dourson*, 2019-Ohio-2495, ¶ 50-51 (12th Dist.). In *Grover*, the trial court found it necessary that the nonresidential father provide $1,237.46 in monthly child support and obligated the father to maintain a $250,000 life insurance policy for his two children. *Id*. The Twelfth District determined that the insurance policy inappropriately exceeded the amount the father would provide in child support by roughly $50,000. *Id*. The court held that "such orders must be structured in a manner that the child will only receive that portion of the insurance proceeds equal to the amount of support the child would have received had the parent remained alive." *Id.*, quoting *Webb v. Webb*, 1997 Ohio App. LEXIS 5968, *36 (2d Dist. Dec. 31, 1997).

**{¶55}** While a unique perspective, we are not persuaded by Husband's argument. This court has yet to adopt a position similar to the *Grover* court requiring that the policy coverage be constrained by the total child support obligation for which a parent would be responsible. In fact, no other court has adopted this approach. While the trial court did not explicitly provide a justification for how it reached the $500,000 policy coverage figure, the court's entry on support recognized that Wife would effectively be the sole caretaker of G.M., and that G.M. was still young. In light of these circumstances, we decline to follow the logic of the *Grover* court and we hold that the order requiring Husband to maintain a $500,000 life insurance policy did not constitute an abuse of discretion.

**{¶56}** Accordingly, Husband's fourth assignment of error is overruled.

### E.  *Return of Property*

**{¶57}** In his fifth assignment of error, Husband suggests the court erred when

it mandated that he return to Wife a miscellaneous assortment of personal property depicted in Exhibit 10. This collection of property allegedly contained family memorabilia as well as jewelry. Husband alleges that the photograph was insufficient to establish that the collection of items were Wife's separate property.

**{¶58}** "We review a domestic relations court's property division in a divorce proceeding for an abuse of discretion." *Devito*, 2022-Ohio-2563, at ¶ 21 (1st Dist.). As stated, determinations concerning witness credibility and the resolution of evidentiary conflicts are for the trier of fact. *Stewart*, 2025-Ohio-1635, at ¶ 22 (1st Dist.), citing *Iranpour-Borounjeni v. Emami*, 2024-Ohio-2546, ¶ 96 (1st Dist.); *see Sangeri v. Yerra*, 2020-Ohio-5520, ¶ 43 (10th Dist.) (holding that a spouse's testimony concerning jewelry given as a marital gift was sufficient to rebut the presumption of marital property).

**{¶59}** Contrary to Husband's assertions, the court did not find that the photographed property was Wife's separate property. Instead, the court's order required that Husband make the property available for the parties to divide and that Husband must return Wife's jewelry. We decline to find that this order was an abuse of discretion.

**{¶60}** Accordingly, Husband's fifth assignment of error is overruled.

### F. Division of Cryptocurrency

**{¶61}** In his sixth assignment of error, Husband requests this court to modify the trial court's order dividing the parties' cryptocurrency so that the parties' wallets are divided by value as opposed to the number of coins.

**{¶62}** As this assignment of error concerns the court's division of marital property, we review the court's entry for an abuse of discretion. *Devito*, 2022-Ohio-2563, at ¶ 21 (1st Dist.). A court may use the date of the final hearing or another date

if the former is inequitable in determining the marriage's end date for the division of property. *Rehmert v. Rehmert*, 2024-Ohio-862, ¶ 16 (2d Dist.).

**{¶63}** Below, the court determined that it would be equitable for the parties to divide their wallets by the number of coins. The parties submitted to the court a joint stipulation of facts which identified different wallets containing different coins. Husband references no case law in support of his proposition that the court's method was erroneous or that it was inequitable. Therefore, we cannot say that the court abused its discretion when dividing the parties' cryptocurrencies.

**{¶64}** Accordingly, Husband's sixth assignment of error is overruled.

### III.   Conclusion

**{¶65}** For the reasons set forth above, the judgment of the trial court is affirmed.

Judgment affirmed.

**BOCK, P.J.,** and **NESTOR, J.,** concur.